IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re: ) | |
| ) | |
| EDGEWATER MEDICAL CENTER, ) | Case No. 02-B07378 |
| ) | Chapter 11 |
| ) | Honorable Bruce W. Black |
| Debtor/Debtor-in-Possession. ) | Adversary Proceeding No. |
| ) | |
| ) | |
| EDGEWATER MEDICAL CENTER, f/k/a ) | |
| NORTHSIDE OPERATING CO., ) | |
| ) | |
| Plaintiff, ) | |
| vs. ) | |
| ) | |
| ACCESS COMMUNITY HEALTH ) | |
| SERVICES, INC., VITAL COMMUNITY ) | |
| HEALTH SERVICES, INC., WESSEL ) | |
| BENGSTON, B. MACON BREWER, ) | |
| GEORGE CHAPAS, FRED CUPPY, ) | |
| WILLIAM FRULAND, ROGER MAYS, ) | |
| JOHN MULLEN, DAVID SHANAHAN, ) | |
| and GEORGE THOMA, ) | |
| ) | |
| Defendants. ) | |
| ) | |

**04A02330**

FILED
UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS

APR 23 2004

KENNETH S. GARDNER, CLERK
PS REP. - 88

PAID
3077096
APR 23 2004

KENNETH S. GARDNER, CLERK
UNITED STATES BANKRUPTCY COURT
BY

## COMPLAINT

Plaintiff, EDGEWATER MEDICAL CENTER, f/k/a NORTHSIDE

OPERATING CO., ("Edgewater," "Northside" or "Debtor") as Debtor-in-Possession in this case

under Chapter 11 of Title 11 of the United States Code, alleges as follows:

OVERVIEW

1.  This complaint seeks damages against directors of Debtor and other persons who adversely dominated Debtor from no later than 1996 through 2001, and whose failure of care, gross mismanagement, and abuse of control allowed Bainbridge Management ("Bainbridge"), Braddock Management ("Braddock") (collectively, the "management companies") and Peter Rogan to use Debtor as a vehicle to commit criminal healthcare fraud, commit other financial frauds, and to systematically loot and siphon Debtor's assets.  Bainbridge, Braddock and Roger Ehman, an officer of those companies, were indicted and pled guilty to committing Medicare/Medicaid fraud at Edgewater Medical Center.  The federal government suspended Debtor's ability to participate in the Medicare/Medicaid programs as a result of the indictments against the management companies, causing Debtor's financial collapse.

THE PARTIES

2.  Plaintiff Edgewater Medical Center f/k/a Northside Operating Company ("Edgewater" or "Northside" or the "Debtor") is an Illinois not-for-profit corporation. Edgewater is Debtor-in-possession in the above-captioned title 11 case.  Peter Rogan caused Northside to be created in or about 1994, when Rogan sold Edgewater Medical Center to Northside.  From in or about 1994, to in or about May 2000, Northside had a Board of Directors that had a legal and fiduciary obligation to manage, control and supervise the operations of Edgewater.  In truth and in fact, Peter Rogan, through management contracts, interlocking directorships, direct and indirect ownership of affiliated companies and other means, continued to exercise control and influence over the all aspects of the Debtor's operations, even after its sale to Northside.

2

3.   In or about May 2000, Defendant Vital Community Health Services, Inc. ("Vital"), an Illinois not-for-profit corporation, was created as part of a corporate reorganization instigated and directed by Peter Rogan. Vital became the sole corporate member, and direct parent corporation, of Debtor.

4.   In or about May 2000, Defendant Access Community Health Services, Inc. ("Access"), an Illinois not-for-profit corporation, was created as part of the same corporate reorganization instigated and directed by Peter Rogan. Access became the sole corporate member of Vital, and the ultimate parent corporation of Debtor.

5.   Defendant Wessel Bengston ("Bengston") was a member of Defendant Access, and served on the Board of Directors of Defendant Vital, beginning on or about May 2000. Upon information and belief, Bengston is a citizen of the state of Illinois.

6.   Defendant B. Macon Brewer ("Brewer") served on the Board of Directors of Debtor from 1994 through the year 2000. From 2000 through at least 2001, Defendant Brewer served on the Finance Committee of Access. Upon information and belief, Brewer is a citizen of the state of New Jersey.

7.   Defendant George Chapas ("Chapas") served on the Board of Directors of Debtor from 1994 through the year 2000. Beginning in or about May 2000, Chapas served as the Chairman of the Board of Directors of Access. Chapas also served on the Finance Committee of Access, and the Board of Directors of Vital. Upon information and belief, Chapas is a citizen of the state of Indiana.

8.   Defendant Fred Cuppy ("Cuppy") served on the Finance Committee of Access beginning on or about May 2000.  Upon information and belief, Cuppy is a citizen of the state of Indiana.

9.   Defendant William Fruland ("Fruland") served on the Board of Directors of Debtor from at least 1997 through the year 2000.  Fruland served on the Board of Directors of Defendant Access beginning in or about May 2000.  Upon information and belief, Fruland is a citizen of the state of Illinois.

10. Defendant Roger Mays ("Mays") served on the Board of Directors of Defendant Access beginning on or about May 2000, and was Secretary and Treasurer for the Access Board. Upon information and belief, Mays is a citizen of the state of Indiana.

11. Defendant John Mullen ("Mullen") served on the Board of Directors of Vital beginning on or about May 2000.  Upon information and belief, Mullen is a citizen of the state of Illinois.

12. Defendant David Shanahan ("Shanahan") served on the Board of Directors of Defendant Access, and the Board of Directors of Defendant Vital, beginning on or about May 2000.  Upon information and belief, Shanahan is a citizen of the state of Florida.

13. Defendant George Thoma ("Thoma") served on the Finance Committee of Access beginning on or about May 2000.  Upon information and belief, Thoma is a citizen of the state of Missouri.

<u>JURISDICTION</u>

14. On or about February 25, 2002, Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101, et seq. (the "Bankruptcy Code"), in the United States Bankruptcy Court, Northern District of Illinois, Eastern Division.

15. Debtor continues to manage its estate as a debtor in possession pursuant to Section 1107 of the Bankruptcy Code. No chapter 11 trustee has been appointed in this case.

16. Debtor initiates this adversary proceeding pursuant to Rule 7001 (1), (2), (7) and (9) of the Federal Rules of Bankruptcy Procedure, Sections 105, 502, 541, 547 and 550 of the Bankruptcy Code, and 28 U.S.C. § 2201.

17. This Court has jurisdiction over the parties and the subject matter of this adversary proceeding pursuant to 28 U.S.C. §§ 157, 1334 and 2201.

18. This adversary proceeding is a core proceeding within the meaning of 28 U.S.C. § 157(a)(2)(A), (F) and (O) and, accordingly, the Bankruptcy Court has jurisdiction to hear and determine all issues presented herein. In the alternative, this adversary proceeding is related to this Chapter 11 bankruptcy case within the meaning of 28 U.S.C. §157(a), 28 U.S.C. § 1334, and the Northern District of Illinois Internal Operating Procedures 15(a), conferring upon the Bankruptcy Court the jurisdiction to hear and submit proposed findings of fact and conclusions of law regarding all issues presented herein.

19. Venue is proper in the Northern District of Illinois, Eastern Division, pursuant to 28 U.S.C. § 1409(a).

## SUBSTANTIVE ALLEGATIONS

### Criminal Misconduct by Bainbridge, Braddock and its Officers

20. Founded in 1929, Edgewater Hospital, Debtor, was a family-owned hospital until 1989, when Peter Rogan purchased it for $1 million plus the assumption of the Hospital's debts. Rogan, through his wholly-owned entity, Edgewater Operating Company, was the beneficial owner and operator of Edgewater Hospital until 1994, when he purported to sell the hospital to Northside Operating Company (which continued to do business as "Edgewater Hospital") for approximately $34 million.

21. Peter Rogan is a citizen of the State of Indiana. During the period at issue in this complaint, Rogan controlled directly and indirectly the management and operations of Debtor, including all billings, collections, cost reporting, and other financial matters related to its day-to-day operations. Rogan exercised control over the affairs and management of Debtor through his personal involvement in the conduct of the business, his direct or indirect ownership of Bainbridge and Braddock, the commercial entities that managed Edgewater, and through his exercise of control over members of the boards with decision-making authority over the affairs of Debtor.

22. Roger Ehmen is a citizen of the State of Illinois. During the period at issue in this complaint, Ehmen was the Senior Vice President of Marketing for Debtor and was an employee of Bainbridge and Braddock.

23. Braddock Management L.P. ("Braddock") is a California limited partnership. From approximately 1995 to March 2000, Braddock had management contracts with Debtor. These contracts provided that Braddock would act as the exclusive manager of the day-to-day

6

operations of Debtor, and that Braddock would supervise and manage all billings, collections,

cost reporting, and other financial matters related to the day-to-day operations of the hospital.

From approximately 1995 to October 1998, the general partner of Braddock was Waldo Point

Management, which Peter Rogan controlled as its president, by proxy and by power of attorney

24. Bainbridge Management Inc., formerly known as Braddock Management, Inc., is an

Illinois corporation.  At all times relevant herein, Peter Rogan controlled Bainbridge, Inc. as its

President and Director.  From October 1998 to present, Peter Rogan has been trustee for the

Peter Rogan Revocable Trust, which is the sole shareholder of Bainbridge Management, Inc.

From approximately October 1998 to approximately May 2002, Bainbridge Management, Inc.

replaced Waldo Point Management as the general partner of Braddock.

25. Bainbridge Management L.P. ("Bainbridge") is an Illinois limited partnership.

Bainbridge bought out Braddock's contract with Debtor effective March 2000, which meant that

Bainbridge would act as the exclusive manager of the day-to-day operations of Edgewater, and

would supervise and manage all billings, collections, cost reporting and other financial matters

related to the day-to-day operations of the hospital.  From approximately March 2000 until

about May 2001, Bainbridge had a management contract with Debtor.  During the events at

issue in this complaint, Bainbridge Management, Inc. operated and controlled Bainbridge

Management LP as its sole general partner.

26. Throughout the time relevant to this case, Ravi Barnabas, M.D. ("Dr. Barnabas") was

a licensed internist who admitted patients to Edgewater and acted as an attending physician for

patients at Edgewater.  Dr. Barnabas had contracts with Edgewater for a medical directorship as

well as physician recruitment, both of which Ehmen signed.

27. Throughout the time relevant to this case, Sheshiqiri Rao Vavilikolanu, M.D. ("Dr. Rao") was a licensed internist and anesthesiologist who operated a clinic on the south side of Chicago and who referred patients to Edgewater. Two companies Dr. Rao owned - Rao M.D., S.C. and Florascribe, Inc. – had service agreements with Edgewater. Defendant Ehmen signed those service agreements on behalf of Edgewater.

28. Throughout the time relevant to this case, Kumar Kaliana, M.D. ("Dr. Kumar") was a licensed internist who referred patients to Edgewater.

29. Throughout the time relevant to this case, Andrew Cubria, M.D. ("Dr. Cubria") was a licensed cardiologist who had a medical clinic at Edgewater.

30. On May 17, 2001, a federal grand jury indicted Bainbridge, Ehmen, and Drs. Barnabas, Kumar, and Rao, for, among other things, "devising and participating in a scheme to defraud healthcare providers and to obtain money and property by means of false and fraudulent pretenses and to deprive certain individuals of the intangible right of the defendant's honest services in violation of 18 U.S.C. §§ 1341 and 1347." The indictment charged that scheme to defraud commenced no later than the early 1990s, and continued through and including at December 2000.

31. On May 24, 2001, Dr. Kumar pled guilty to Counts One and Nine of the indictment relating to the doctor's acceptance of kickback payments for the admission of patients, and the submission of false claims to Medicare and Medicaid. On October 10, 2001, Dr. Kumar was sentenced to 16 months' incarceration and ordered to pay restitution of $1,156,000 to Medicare and Medicaid.

32. On May 24, 2001, Dr. Rao pled guilty to Count 57 of the indictment, on racketeering under 18 U.S.C. § 1962. On October 10, 2001, Dr. Rao was sentenced to 35 months of incarceration and ordered to pay restitution of $5 million to Medicare and Medicaid.

33. On October 1, 2001, Dr. Barnabas pled guilty to Count 57 of the indictment, racketeering under 18 U.S.C. § 1962. On November 28, 2001, Dr. Barnabas was sentenced to 52 months' incarceration and ordered to pay restitution of $100,000 to Medicare and Medicaid.

34. On October 1, 2001, Ehmen pled guilty to Count 57 of the indictment, racketeering under 18 U.S.C. § 1962. In pleading guilty and again at his sentencing, Ehmen admitted directly and through his attorney that he was in fact guilty, and that he was responsible for coordinating with Peter Rogan and a number of doctors to perpetrate a scheme to defraud Medicare, Medicaid, and other insurers. Ehmen, through his attorney, stated unequivocally that Peter Rogan was the chief leader and organizer of the scheme and that Ehmen served merely as a manager, carrying out the orders of Peter Rogan. Ehmen admitted that among the ways in which he and Rogan perpetrated this scheme, Rogan and Ehmen directly and indirectly: submitted and caused others to submit false and fraudulent billing information to Medicare, Medicaid, and other insurers; caused doctors to perform a large number of medically unnecessary procedures to generate fees for Edgewater; and paid and caused others to pay bribes and kickbacks to doctors to cause them to admit patients to Edgewater irrespective of the patients' need for medical care. Through his lawyer, Ehmen stated that in the cases of Drs. Barnabas and Rao, Peter Rogan finalized the contours of the kickback arrangements with those doctors and then sent them to Ehmen to get contracts drafted. Ehmen admitted that he and Rogan perpetrated this scheme to falsely inflate the revenues of Edgewater. On November 28,

2001, Defendant Ehmen was sentenced to 78 months' incarceration and ordered to pay restitution of $5 million to Medicare and Medicaid.

35. On October 4, 2001, a federal grand jury returned a superseding indictment against Bainbridge and also charged Bainbridge, Inc. and Dr. Cubria. The complaint charged Dr. Cubria with acting to defraud Medicare and Medicaid by billing those entities for invasive medical procedures that were not medically necessary. The medically unnecessary invasive procedures the indictment referenced included cardiac catherizations and angioplasties.

36. On February 8, 2002, Dr. Cubria pled guilty to Count 57 of the indictment, racketeering under 18 U.S.C. § 1962. In pleading guilty, Dr. Cubria admitted that he was guilty of racketeering, which included that he and others engaged in a pattern of racketeering activity made up of a pattern of acts of mail and wire fraud, that were separate and continuous through an enterprise engaged in interstate commerce. More specifically, Dr. Cubria admitted that he took numerous actions to increase Edgewater's revenues by obtaining revenues from Medicare, Medicaid and other insurers through a scheme and artifice to defraud and obtain money through false and fraudulent pretenses representations, and promises. In this respect, Dr. Cubria admitted that he acted in conjunction with a number of individuals, including Roger Ehmen, and an individual identified only as "Person A." On information and belief, "Person A" is Peter Rogan. Dr. Cubria also admitted that the false and fraudulent activities of himself, Ehmen, and "Person A" (on information and belief, Peter Rogan) included obtaining revenues from Medicare, Medicaid and other insurers by: (i) performing hundreds of medically unnecessary tests and procedures (at least half of the procedures he performed) to generate fees for Edgewater and himself; (ii) in January 1999 and April 2000, performing medically unnecessary angioplasties upon two patients, each of whom died as a result of the unnecessary procedures,

after which Dr. Cubria specifically admitted that Ehmen and "Person A" (on information and

belief, Peter Rogan) encouraged him to continue to perform additional unnecessary

angioplasties despite the two patients' deaths; (iii) receiving financial payments and benefits

from Edgewater ("kickbacks and bribes") to exchange for patient admissions, many of which

involved patients that did not need medical treatment; and (iv) making false entries on medical

records and bills and on submissions to Medicare, Medicaid, and other insurers either to obtain

revenue for Edgewater, himself, and others or to conceal the foregoing racketeering activity.

Dr. Cubria admitted that he and others did these things so as to conduct the affairs of Edgewater

through a pattern of racketeering activity.  On April 25, 2002, a federal district judge in Chicago

sentenced Dr. Cubria to 12 ½ years' incarceration and ordered him to pay restitution of $14M to

Medicare and Medicaid.

37. On or about January 15, 2003, Braddock and Bainbridge pled guilty to federal felony

charges that they used Edgewater to operate a scheme to defraud Medicare and Medicaid in the

amount of approximately $13,644,598.  Braddock and Bainbridge entered into their respective

plea agreements pursuant to the directive of Defendant Bainbridge Inc., which Defendant Rogan

(Bainbridge, Inc.'s sole director) authorized.

38. In pleading guilty to the federal felony charges, i.e., health care fraud in violation of

18 U.S.C. § 1347, Braddock and Bainbridge admitted that, from in or about 1995 and

continuing until approximately December 2000, Braddock and Bainbridge, in conjunction with

Ehmen and others, devised and intended to devise, and participated in a scheme to defraud and

obtain money and property from Medicare, Medicaid and private insurance companies by means

of materially false and fraudulent pretenses, representations and promises including but not

limited to the following:

11

a) causing Edgewater to make payments and kickbacks to certain doctors and other individuals in exchange for patient referrals and concealing these payments and kickbacks by creating contracts and other instrumentalities that created the false impression that the payments and kickbacks were for legitimate services;

b) concealing and causing others to conceal from Edgewater that doctors receiving the payments and kickbacks were recruiting patients by giving patients cash and/or other benefits and promising these patients that hospital services would cost the patients nothing;

c) coaching and causing others to coach patients to lie about their physical condition;

d) lying and causing others to lie to patients regarding their need for hospitalization;

e) admitting and causing others to admit patients to Edgewater who did not need to be admitted to Edgewater for any medically necessary reason;

f) performing and causing others to perform medically unnecessary procedures and testing on certain patients;

g) creating and causing others to create false records to justify and support claims submitted to insurers, including false medical and business records;

h) submitting and causing others to submit false and fraudulent claims to Medicare, Medicaid, and private health insurers fraudulently seeking compensation for medically unnecessary admissions, services, procedures and testing, and for services rendered to patients who were referred to Edgewater in exchange for kickbacks; and

i) submitting and causing others to submit cost reports to Medicare that falsely represented that services provided by Edgewater were provided in compliance with the laws and regulations regarding the provision of health care services.

39. As a result of the scheme described above which they perpetrated, Braddock and

Bainbridge have admitted that Medicare and CMS were fraudulently billed approximately

$13,644,598.

The Northside, Vital and Access Boards of Directors: 1996 through May 2001

40. From 1996 through September 1998, the Board of Directors of Debtor ("Northside"

or "Edgewater") consisted of five members: Bert Rosenthal, Stina Hans, George Chapas, B.

Macon Brewer and William Fuland. Upon information and belief, at least three of the members

of the Northside Board (Defendants Chapas, Brewer and Fruland) were persons with long-standing affiliations to Peter Rogan. On or about September 19, 1998, Stina Hans resigned and Jane Hurd took her seat. Hurd resigned less than two months later, on November 1, 1998. Upon information and belief, after the 1998 resignation of Ms. Hurd, the vacancies on the Northside board remained unfilled.

41. From 1996 until October 1998, Permian Health Care Inc., a Colorado not-for-profit corporation, was the parent holding company of Debtor as its sole member. Permian's powers with respect to Debtor were limited, and consisted only of the power to vote to elect and remove Debtor's directors. The Debtor's bylaws and articles of incorporation granted Permian no other member voting rights.

42. In or about October 1998, Debtor's Board amended its bylaws to render Debtor a self-perpetuating entity, wholly separate from Permian. Pursuant to Article 2 of Debtor's amended bylaws, all policymaking powers for Debtor was vested in the Northside Board, including responsibility, control and management over all the policies, properties, affairs and funds of the corporation.

43. In or about May 2000, at the instigation of Peter Rogan, Debtor's Board authorized a corporate reorganization, pursuant to which Debtor became part of a parent holding company structure. The sole corporate member of Debtor became Defendant Vital. The sole corporate member of Defendant Vital became Defendant Access.

44. Following the 2000 corporate reorganization, Debtor retained a local, advisory board of directors. However, this board had virtually no authority, retaining power only as to matters relating to credentialing, medical staff, and the like. Actual decision-making authority over all

significant matters pertaining to Debtor was reserved and exercised by the Board of Directors of

Defendants Vital and Access.  These powers encompassed sole authority to make all major

decisions on behalf of Debtor, including, among other things, appointing its directors, amending

its corporate documents, approving budgets, strategic plans and construction projects, approving

major corporate transactions such as mergers, sale or dissolution, approving the compensation

of Debtor's managers, authorizing real estate purchases and sales, and making determinations as

to whether litigation should be pursued on behalf of Debtor.  Decision-making authority

regarding financial matters was reserved in the Finance Committee of Defendant Access, who

exercised that power on behalf of Debtor.

45. At no time following the 2000 corporate reorganization did the Access, Vital and

Edgewater Boards observe the requisite corporate formalities, although the Access, Vital and

Edgewater Boards purported to represent separate corporate entities.  By way of illustration, at

no time did the Access, Vital and Edgewater Boards meet separately.  Individual directors of

Access and Vital, including David Shanahan and William Fruland, were frequently unaware of

which boards they were serving on, and on behalf of which corporate entity they purportedly

took corporate action.

46. Non-director members of the Access Finance Committee (specifically, Defendants

Cuppy, Thoma, Shanahan, Bengston and Brewer) routinely attended meetings of the Access

Board, through their actions conducting themselves as directors of Access, as did Peter Rogan,

though Rogan was putatively not a member of any of the boards.  Upon information and belief,

Peter Rogan's personal attorney, John Tatooles, routinely attended the board meetings as well,

and kept the minutes of the various boards of directors, rather than such records being created

and maintained by counsel acting on Debtor's behalf.

The Management Companies' Criminal Misconduct

47. By operation of law, each of the Defendants owed fiduciary duties to Debtor. Each of

Defendants Vital and Access owed fidiciary duties to Debtor as its parent corporations. Each of

Defendants Bengston, Chapas, Fruland, Mays, and Shanahan owed fiduciary duties to Debtor as

directors of Debtor or its parent holding companies. Defendants Brewer, Cuppy, and Thoma

owed fiduciary duties to Debtor as members of the Finance Committee of Access, which

exercised control and policymaking authority over Debtor's financial affairs pursuant to the

bylaws of the respective organizations.

48. As fiduciaries to Debtor, each of the Defendants owed Debtor the duty to exercise a

high degree of care, loyalty and diligence in the performance of their responsibilities with

respect to the management, administration, supervision and monitoring of the affairs of Debtor,

as well as in the use and preservation of its property and assets. Each of the Defendants owed

Debtor a duty of utmost loyalty, requiring actions at all times in the best interests of Debtor, and

not in their own interests, or in the interests of a third party.

49. To discharge their legal duties, the Defendants were required to, among other things,

exercise reasonable and prudent supervision over the Company's management, policies,

practices, controls, and financial affairs. Over the years, the members of the Northside, Vital

and Access Boards received repeated and substantial indication of serious misconduct at Debtor.

In violation of their fiduciary duties, the Defendants failed to exercise reasonable and prudent

supervision, permitting Rogan and the management companies to conduct the Debtor's business

in an imprudent and illegal manner through the fraudulent and unsafe billing practices and other

wrongful conduct detailed herein. The Defendants failed to take timely steps to stop crimes and

other wrongdoing from being committed and failed to mitigate the adverse financial effect of

such crimes and other wrongdoing upon Debtor, even though the Defendants received repeated and substantial indication that criminal conduct and other wrongdoing being perpetrated by the management companies and persons working on their behalf.

50. Beginning as early as 1996, there were numerous clear signals that the management companies and persons working on their behalf were engaged in wrongdoing.  Defendants disregarded these clear warning signs in failing to investigate, identify and address misconduct at Debtor.

51. In April 1996, Modern Healthcare reported that the persons acting on behalf of Debtor were receiving improper referrals by a CHA clinic, that bribes were being to given CHA building presidents to refer residents to the hospital, and that the clinic was improperly administered.  Dr. Cubria, one of the doctors who was ultimately indicted and pleaded guilty to fraud, was directly involved in the scheme.

52. Upon information and belief, in the spring of 1996, the Debtors' board was advised of a pending investigation by the Illinois Attorney General.  In or about May 1996, the Illinois Attorney General's Office deposed Peter Rogan in relation to the state investigation.

53. On or about September 17, 1998, the United States Department of Justice served a subpoena duces tecum upon Debtor, seeking the production of medical files of patients treated at Edgewater.  The subpoena stated that the documents were related to an investigation of "federal healthcare offenses as defined in 18 U.S.C. § 24(a)."  The subpoena was addressed to Peter Rogan, President, Edgewater Hospital..  The subpoena sought patient medical records of approximately 87 Medicaid patients.

54. In 1999, Debtor's Board learned of additional misconduct by the management companies and its employees when it approved entry into a Corporate Integrity Agreement with the Office of Inspector General ("OIG"), following an investigation by OIG into systemic overpayments being made to the Hospital as the result of "upcoding" of certain patient conditions. No action was taken to terminate the management companies at that time, even though the Board knew or should have known the management companies caused or allowed such conditions to take place, in violation of the terms of the management contracts between those entities and Debtor.

55. As a result of entry into the Corporate Integrity Agreement, the Defendants had a heightened duty to ensure that Debtor operated at all times within the regulatory and legal framework to which it was subject. Each of the Defendants were advised (the Northside directors, at the time of the agreement, and the Access and Vital directors in 2000, shortly after they joined Defendants' boards) that the OIG agreement required them, on an annual basis, to (a) engage an independent accounting group to review the billing procedures and actual bills prepared by Debtor; (b) engage an independent agency to review Debtor's overall compliance with the laws; (c) ensure that overpayments by Medicare and Medicaid were found and reported to the relevant agency and the OIG, and (d) submit annual reports to the OIG regarding the Hospital's fulfillment of its obligations under the Corporate Integrity Agreement.

56. Upon information and belief, each of the Defendants relied completely on the management companies, its officers, and legal advisors engaged by the management companies to ensure Debtor's compliance with its regulatory and legal obligations, even though such reliance was unreasonable based on the facts and circumstances known to them at the time.

17

57. After entry into the Corporate Integrity Agreement, and repeated notice of prior misconduct by the management companies, the Defendants' total failure to monitor, investigate and respond to the continuing and repeated signs of wrongdoing by the management companies constituted a willful and wanton violation of their duties to Debtor.

58. In late 1999 or early 2000, the Defendants were advised that criminal investigatory subpoenas had issued, and that a federal investigation was pending, against Edgewater, the management companies, and several of its officers, including Peter Rogan and Roger Ehman for potential Medicare/Medicaid fraud.  However, no action taken by the Defendants to suspend or remove the management companies.

59. In March 2000, at a combined meeting of the Access and Vital Boards, the Defendants were advised by criminal counsel, in a a presentation that lasted more than five and a half hours, that the hospital and the managements were indictable based, at least in part, on the conduct of Roger Ehman detailed herein.  No action was taken by the Board beyond appointment of a subcommittee comprised of Bert Rosenthal, Fred Cuppy and David Shanahan to report to the boards regarding on-going developments.

60.  At an April 2001 meeting of the Board, Dr. Rosenthal, a member of the Access Board, advised his fellow board members that he believed an on-going fraud existed, at which point Defendants Brewer and Cuppy objected, claiming that they had never been advised fraud was occurring, and that such accusations were false.  In sworn testimony given on October 17, 2002, Defendant Shanahan stated that this meeting of the board was "the first discussion that the board really ever considered of terminating Mr. Rogan and Bainbridge."

61. At the April 2001 meeting, criminal counsel reminded the Defendants of the March 2000 presentation that had been made regarding the results of counsel's investigation. Rosenthal departed the meeting with criminal counsel. Within days, Rosenthal received notice from Defendant Bengston (who was not even a member of the Access board) that he had been summarily removed as a director for his statements at the April board meeting. Rosenthal's removal was then confirmed in writing in a letter from Defendant Chapas on behalf of the Board.

62. The Defendants took no action against the management companies, which continued to operate and occupy the premises of Debtor, until they were finally terminated on May 9, 2001, the day prior to their indictment.

63. The Defendants' disregard of their fiduciary obligations to Debtor, their failure to act in good faith, and their failure to exercise oversight and supervision over the affairs of Debtor has been acknowledged, conceded, and admitted by multiple members of those Boards. The Access Board relied entirely on Rogan-affiliated consultants and the management companies for its information, and "created its edicts and [gave] direction at the direction of its consultants." Defendants exercised no supervision over the management companies. "and there never has been supervision." The boards of Northside, Access and Vital acted contrary to the best interests of Debtor, and "indeed allowed the management company to participate, aid and abet fraud, after having absolute knowledge of its existence through [its criminal counsel]," and by having "not acted and [having] continued to act in a way to damage the institution they're responsible to."

Self-Dealing and Interested Party Transactions

64. From no later than 1996 to at least 2001, the directors who served on the boards of Debtor, Vital, and Access approved, ratified and awarded tens of millions in payments to management companies and other entities associated with Peter Rogan, failing to receive fair value in return for those contracts.

65. The Defendants were unable and did not exercise good faith, independent business judgment in approving or ratifying transactions involving Peter Rogan and companies affiliated with him, insofar as each of the individual Defendants named herein suffered from disabling conflicts of interest that directly or indirectly rendered them unable to assess the merits of such transactions. In approving or ratifying the transactions, the Defendants either acted at specifically at Rogan's direction, or failed to exercise independent business judgment.

66. Upon information and belief, these defalcations resulted from Defendants' long-standing personal, business and financial interconnections with Rogan and his affiliated companies. Upon information and belief, some of the individual Defendants also had personal financial interests in entities doing business with Debtor which were undisclosed, in violation of Debtor's written conflict of interest policy.

67. Upon information and belief, although section 2.16 of Debtor's restated bylaws, as of May 2000, specifically states that "Directors and members of all committees of the board of directors shall not receive any compensation for any services in their capacity as a director or board committee member ... [except] compensation ... for expenses actually incurred for serving the corporation as a director or board committee member," some or all of the directors

received thousands of dollars a year in stipends as a quid pro quo for their service on the

aforementioned boards.

68. Upon information and belief, Defendant Wessel Bengston is a long-time friend and

business associate of Peter Rogan. During the time frame relevant to this complaint, Bengston

received substantial compensation for performing accounting services and other work for Peter

Rogan, including preparation of tax returns for Rogan, trusts accounts associated with Peter

Rogan, and various Rogan affiliated business entities. Upon information and belief, Rogan

continues to refer accounting work to Bengston's son, who manages Bengston & Co., Ltd, the

accounting firm with which Defendant Bengston was affiliated before he retired. Upon

information and belief, Bengston areceived directors' fees, lavish trips and other perquisites for

service on the Board of Directors for numerous other entities affiliated with Debtor and Peter

Rogan, including Edgewater Grant Property Company, Edgewater Foundation, and Chicagoland

Services Foundation. These and other benefits conferred by Rogan rendered Benston unable to

render independent business judgment in matters pertaining to Peter Rogan.

69. Upon information and belief, Defendant B. Macon Brewer and Peter Rogan have

been friends and business associates for at least fifteen years. Brewer serves as contingent co-

trustee for the Peter Rogan Revocable Trust, which was created in 1988. Upon information and

belief, the Peter Rogan Revocable Trust has received numerous transfers of funds paid by

Edgewater to the management companies. Brewer also serves as contingent co-trustee for Peter

Rogan's childrens' trusts, which receive approximately 99% of the revenues Edgewater paid to

the management companies. The childrens' trusts also hold an ownership interest in PGR.

70. Upon information and belief, Defendant Brewer has additional business dealings and ventures with Rogan or companies affiliated with Mr. Rogan that are not referred to or reflected in Debtor's corporation minutes, in violation of Debtor's written conflict of interest policy. These and other benefits conferred by Rogan, including lavish trips and other perquisites for Board service,rendered Brewer unable to render independent business judgment in matters pertaining to Peter Rogan.

71. Upon information and belief, Defendant George Chapas and Peter Rogan have been good friends and business associates for more than twenty years. Chapas has had long-standing business relationship and economic dependence on Peter Rogan. Upon information and belief, Chapas lived on Bainbridge Street in Schaumberg, Illinois at the same time Rogan lived on that street. Upon information and belief, Chapas and Rogan currently own homes in Valaparaiso, Indiana, where both now reside, that are located approximately 2000 feet apart. Peter Rogan invited George Chappas to serve on the board because of "common interests" and "common ownership interests in many entities." A fellow member of the Vital and Access Board has referred to Chapas as Rogan's "puppet" on those Boards. Upon information and belief, Chapas' additional business dealings and ventures with Rogan or companies affiliated with Mr. Rogan are not referred to or reflected in Debtor's corporate minutes, in violation of Debtor's conflict of interest policy. Upon information and belief, Rogan has referred business to Chapas's company, Instructional Design Associates. These and other benefits conferred by Rogan, including lavish trips and other perquisites for Board service, rendered Chapas unable to render independent business judgment in matters pertaining to Peter Rogan.

72. Upon information and belief, Defendant Fred Cuppy owns residential property in Valparaiso, which is co-owned with Defendants Mays, that is located approximately 7000 feet

22

from Rogan's residence, and within 5000 feet of Chapas' residence. Cuppy has received

significant compensation for performing legal work for trust accounts associated with Peter

Rogan and/or Peter Rogan's children. Upon information and belief, Cuppy also received

significant compensation for performing legal work to create certain off-shore accounts, at

Rogan's request, to which a substantial quantity of Edgewater's funds have been transferred.

73. Upon information and belief, Cuppy has participated in other joint business ventures

with Peter Rogan (either directly, or indirectly through individuals are affiliated with Peter

Rogan, such as Rogan's assistant, David Miller). These ventures include, but are not limited to,

Diagnostic Equipment, Inc., Computersmarts.net and certain real estate investments in

Savannah, Georgia. Cuppy serves as the Managing Director of Boulevard Investors, Ltd., a

limited partner in Bainbridge. Cuppy is also the Trustee for the Sara Caitlan Rogan Trust, the

Brian Peter Rogan Trust, and the Robert Cashman Rogan Trust. These trusts, which were

created for the benefit of Peter Rogan's children, receive approximately 99% of the revenues

paid by Edgewater to the management companies. Cuppy is also named as a contingent co-

trustee for the Peter Rogan Revocable Trust which received, upon information and belief,

numerous transfers of funds that Edgewater paid to the management companies.

74. Based on the best information presently known to Debtor, Cuppy's additional

business dealings with Rogan or companies affiliated with Mr. Rogan are not referred to or

reflected in Debtor's corporate minutes, in violation of Debtor's conflict of interest policy.

These and other benefits conferred by Rogan, including lavish trips and other perquisites for

Board service, rendered Cuppy unable to render independent business judgment in matters

pertaining to Peter Rogan.

75. Upon information and belief, Defendant William Fruland has been a friend and business associate of Peter Rogan for more than twenty years. Defendant Fruland resided in Schaumberg, Illinois on Bainbridge Street at a time Rogan also lived there. Upon information and belief, Fruland has additional business dealings with Rogan or companies affiliated with Mr. Rogan that are not referred to or reflected in Debtor's corporate minutes, in violation of Debtor's conflict of interest policy. Upon information and belief, Fruland also received directors' fees, lavish trips and other perquisites for service on the Board of Directors for other entities affiliated with Debtor and Peter Rogan, including Chicagoland Services Support Foundation and Hope Community Health Services, Inc. These and other benefits conferred by Rogan rendered Fruland unable to render independent business judgment in matters pertaining to Peter Rogan.

76. Upon information and belief, Defendant Roger Mays currently resides in Valparaiso, as does Peter Rogan and George Chappas. Upon information and belief, Mays' residential property in Valparaiso, which is co-owned with Defendant Cuppy, is approximately 7000 feet from Rogan's residence, and within 5000 feet of Chapas' residence. Upon information and belief, as of June 2002, Mays was employed as the Supervisor in the Service and Maintenance Department in the Burns Harbor, Indiana Division of Bethlehem Steel, and was selected for Board service not based on his qualifications, but solely because of his personal loyalty to Peter Rogan and his willingness to vote in accordance with Rogan's wishes.

77. n the year 2000, Mays spoke on behalf of and acted for the interests of Peter Rogan and  the management companies in negotiations with Dexia Credit Local, one of Debtor's largest creditors, actively preferring the interests of Rogan and the management companies over those of Debtor. Upon information and belief, Mays has additional business dealings with

Rogan or companies affiliated with Mr. Rogan that are not referred to or reflected in Debtor's corporate minutes, in violation of Debtor's conflict of interest policy. These and other benefits conferred by Rogan, including lavish trips and other perquisites for Board service, rendered Mays unable to render independent business judgment in matters pertaining to Peter Rogan.

78. Upon information and belief, Defendant John Mullen has received substantial compensation for real estate consulting services provided to Peter Rogan and/or Rogan-affiliated companies, including work relating to the development of properties next to Edgewater, through which Mullen stood to profit handsomely. Upon information and belief, Mullen also received directors' fees, lavish trips and other perquisites for service on the Board of Directors for numerous other entities affiliated with Debtor and Peter Rogan, including the Edgewater Foundation, Chicagoland Services Support Foundation, Chicagoland Services Foundation, and Hope Community Health Services, Inc. These and other benefits conferred by Rogan rendered Mullen unable to render independent business judgment in matters pertaining to Peter Rogan.

79. Upon information and belief, Defendant David Shanahan and Peter Rogan have been friends and business associates for more than twenty years. David Shanahan owns residential property in Longboat Key, Florida, as does Rogan. Upon information and belief, these properties are located less than 15 miles from one another. Shanahan worked at Ernst & Young with Rogan early in his career.

80. hanahan became was vice president of finance at Valuation Counselors, a company that Rogan regularly employed to provide valuation reports of Edgewater's equipment and other assets. Upon information and belief, Shanahan received substantial compensation for this work.

In or about 1994, Valuation Counselors performed a valuation of Edgewater which helped

Rogan get a $7 million loss on sale rebate from the government related to Medicare. At the time

Rogan sold Edgewater Medical Center to Northside, Valuation Counselors also provided the

valuation of the retained properties, discussed *infra*, at the request of Mr. Rogan. Valuation

Counselors provided the valuation report of Dr. Cubria's medical practice at a time when Rogan

and/or Ehman proposed to the Debtor's Board that Cubria's practice be bought out. Upon

information and belief, the proposed purchase of Dr. Cubria's medical practice was part of an

effort by the management companies and Rogan to conceal the nature of the relationship

between Cubria and Edgewater as part of the Medicare fraud they were then perpetrating.

81. Shanahan's willingness to act at Rogan's direction and instruction continued even

after the Boards received legal advice that indictment was eminent, and that Debtor should

terminate the management companies. After receiving that advice, Shanahan continued to act to

benefit Rogan at the expense of Debtor. On repeated occasions, Shanahan called Edgewater

personnel, minutes after speaking with Rogan, to demand that Rogan's management companies

receive immediate payment of hundreds of thousands of dollars in supposedly outstanding

management fees. In or about October 2001, Shanahan instructed Edgewater employees to

withhold information from McDermott, Will & Emory, Debtor's attorneys at the time, and

excluded counsel from Board of Director's meetings. At or about that time, McDermott then

resigned.

82. Upon information and belief, Shanahan received almost $36,000 in direct payments

from Edgewater in the timeframe between March 2001 to November 2001 alone. Upon

information and belief, Defendant Shanahan has other business dealings with Rogan or

companies affiliated with Mr. Rogan that are not reflected in Debtor's corporate minutes, in

violation of Debtor's conflict of interest policy. Upon information and belief, Shanahan also

received directors' fees, lavish trips and other perquisites for service on the Board of Directors

for numerous other entities affiliated with Debtor and Peter Rogan, including Edgewater Grant

Property Company, Edgewater Foundation, and Chicagoland Services Support Foundation.

These and other benefits conferred by Rogan rendered Shanahan unable to render independent

business judgment in matters pertaining to Peter Rogan.

83. Upon information and belief, Defendant George Thoma and Peter Rogan have been

friends and business associates for over ten years. Defendant Thoma worked with Peter Rogan,

and served on the Board of Debtor with Peter Rogan prior to Rogan's 1994 sale of Debtor to

Northside Operating Co. Thoma served as President of Chicagoland Medical Associates, PC,

which did business with the management companies, until its voluntary dissolution in or about

September 2001. Upon information and belief, Thoma also received directors' fees, lavish trips

and other perquisites for service on the Board of Directors for numerous other entities affiliated

with Debtor and Peter Rogan, including Edgewater Foundation, Chicagoland Services Support

Foundation, Chicagoland Services Foundation, and Hope Community Health Services, Inc..

These and other benefits conferred by Rogan rendered Thoma unable to render independent

business judgment in matters pertaining to Peter Rogan.

84. Due to these disabling conflicts of interest, each of the Defendants failed to act with

the loyalty, good faith, and due care they owed Debtor by approving and/or ratifying

transactions benefitting or involving the management companies, Peter Rogan and/or companies

affiliated with Rogan, at the expense of Debtor. In each of these transactions, Defendants knew

or recklessly disregarded that the transaction unreasonably benefitted Rogan or the company

affiliated with Rogan at the expense of Debtor. Included among the transactions or transfers

that one or more of the Defendants improperly approved were, inter alia, (a) the approval of

management fees and other compensation to Rogan and the management companies; (b) the

transfer of Edgewater assets to affiliated entities for no consideration to Debtor; (c) the failure to

exercise the option to purchase property owned by EPC; (d) the transfer of Edgewater assets to

Vital and/or Access for no consideration as part of the year 2000 restructuring; (e) the approval

of lease terms and other matters relating to real estate owned by companies affiliated with Mr.

Rogan, on terms at a substantial detriment to Debtor; and (f) the approval of the transfer of

funds from Edgewater to Access and Vital.

85. At meetings of the Boards of Debtor, Access, and Vital where management fees and

other compensation to the management companies and Rogan were approved, Rogan provided

the Defendants with a "bottom line" number for compensation, without any breakout of

employee salaries or costs (e.g. with no disclosure of how much Rogan or his family would

receive). Defenants rubberstamped Rogan's recommendations without conducting additional

inquiries. Defendants never conducted any on-going or subsequent review of the management

companies' performance.

86. As early as 1998, by virtue of the Coopers & Lybrand report, Defendants were on

notice that the fees the management companies charged were among the highest in the nation.

Such information should have led Defendants (including, specifically, Defendants Brewer,

Chappas and Fruland) to undertake a thorough, fair, and unbiased review of the reasonableness

of the fees. Defendants Brewer, Chappas and Fruland did not do so. Intead, these Defendants

allowed Rogan to engage in "opinion shopping," and approved substantial and excessive

increases in management fees in 1998. Upon information and belief, the Defendants approved

these increases even before they had received additional advice regarding the purported

reasonableness of those fees. Upon information and belief, the Defendants also knew recklessly

disregard that the supplemental advice they received regarding the purported reasonableness of

the management fees was not objective, thorough, or independent, insofar as it was procured

from Shanahan's company, Valuation Consultants, which had received substantial fees for many

years based on its long-standing business relationship with Rogan.

87. In or about May 2000, various defendant board members again approved substantial

and excessive increases in the management companies' fees, the Board purported to rely on

advice given by Robert Baudino, an attorney Rogan engaged, regarding the reasonableness of

such fees. The Board knew or should have known that that the counsel engaged by Rogan could

not and did not provide objective, thorough and independent advice regarding reasonableness of

fees, given that counsel examined less than five, hand-selected hospitals (whereas the Coopers

report canvassed more than a dozen). The Board also knew or should have known that the

counsel engaged by Rogan could not and did not provide objective, thorough and independent

advice regarding the reasonableness of the management fees, both because such advice was out

of a legal professional's given area of expertise, and given Baudino's receipt of many thousands

of dollars in consulting business, directed by Rogan and paid for by Edgewater, for work

relating to the acquisition of other hospitals.

88. Due to the disabling conflicts of interest detailed above, various Defendant board

members failed to act with the loyalty, good faith, and due care they owed Debtor by approving

and/or ratifying transfers and/or gifts of Edgewater funds to other companies at Rogan's

recommendation and request. These transactions include: a 1998 transfer of $3 million from

Edgewater to Chicagoland Services Support Foundation ($1 million of which was immediately

"gifted" to French Medical Center, a subsidiary of Permian Healthcare) in connection with the

1998 separation from Permian; a 1996 transfer of $10 million from Edgewater to Vista Health

Care Inc. ($4 million of which the board chose to forgive in 1999, and the remainder of which

the board refused to take action to collect); a 1999 transfer of $3 million from Edgewater to

Permian as part of a so-called consulting agreement, pursuant to which, upon information and

belief, consulting services were never rendered; and (d) a 2000 transfer of Debtor's $10 million

interest in Healthcare Services Corp. to Chicagoland Services Support Foundation. Upon

information and belief, Debtor received no consideration for these transfers, and such transfers

were made solely to further the business interests of Peter Rogan and his affiliated companies,

rather than the interests of Debtor.

89. In connection with the year 2000 restructuring, various Defendant board members

caused Access and Vital, as well as numerous other Edgewater affiliates, to enter into

management and/or service contracts with the management companies, pursuant to which the

management companies received tens of thousands of dollars for services that the management

companies were already providing to Edgewater under the existing management agreement.

Upon information and belief, these payments were funded directly or indirectly by Edgewater.

Upon information and belief, the additional management services were duplicative, unnecessary

or non-existent. Upon information and belief, the Defendants authorized the contracts,

payments and transfers in order to benefit and enrich Peter Rogan and his affiliated companies,

rather than acting in the best interests of Debtor.

90. In or about 1999, Defendants Chappas, Fruland and Brewer approved the transfer of

$10 million of the Debtor's funds in connection with the purchase Grant Hospital, a financially

distressed entity located in Chicago. Debtor's interest in Grant was held in Edgewater Grant

Property Company. As part of the 2000 restructuring, the Defendants authorized the transfer of

a $10 million interest in Edgewater Grant Property Company from Debtor to Defendant Vital.

Upon information and belief, Debtor received no consideration for this transfer.

Leases

91. Due to the disabling conflicts of interest detailed above, the Defendants failed to act

with the loyalty, good faith, and due care they owed Debtor by approving and/or ratifying lease

contracts Debtor allegedly entered into with EPC and PGR, property companies that Peter

Rogan owned and controlled , and by failing to exercise an option that Debtor had to purchase

the property that EPC owned.

92. In 1994, when Rogan sold his interest in Edgewater Hospital to Northside Operating

Company, Rogan retained after the sale and continues to own a significant portion of the real

estate that Debtor used as an active hospital.  Through companies that Rogan owned – EPC and

PGR – Rogan retained this real estate.  In doing so, Rogan caused Debtor to be dependent upon

EPC and PGR for Edgewater's operation as a hospital.  Through this dependence, Rogan and

companies affiliated with him were able to funnel money out of Debtor to develop Rogan's

properties and provide Rogan with additional leverage over Debtor.

93. The property that Rogan retained through EPC (the "EPC Property") was:

> The real property commonly known as the Medical Office Building and legally
> described as follows:  Lot 1, in Edgewater Property One Subdivision, being a
> Resubdivision of part of Block 4, in Ashland Avenue and Clark Street Addition to
> Edgewater, being a Subdivision in parts of Sections 5 and 6, Township 40 North,
> Range 14, East of the Third Principal Meridian, in Cook County, Illinois.

> Also described as:  East 73.31 feet of Lots 1 and 2, and the East 73.31 feet of the
> North 6.13 feet of Lot 3 (except that part taken for widening of North Ashland
> Avenue by Deeds recorded as Document Numbers 9225033, 9225054, 9225056
> and 9225057), also all of Lots 54 to 61, both inclusive in Block 4, in Ashland

Avenue and Clark Street Addition to Edgewater, being a Subdivision in parts of
Section 5 and 6, Township 40 North, Range 14, East of the Third Principal
Meridian, in Cook County, Illinois;

The real property commonly known as the Stem Building and legally described as
follows: Lot 2, in Edgewater Property One Subdivision, being a Resubdivision of
part of Block 4, in Ashland Avenue and Clark Street Addition to Edgewater,
being a Subdivision in parts of Sections 5 and 6, Township 40 North, Range 14,
East of the Third Principal Meridian, in Cook County, Illinois;

The real property commonly known as the Connecting Tunnel Building and
legally described as follows: Lot 3, in Edgewater Property One Subdivision,
being a Resubdivision of part of Block 4, in Ashland Avenue and Clark Street
Addition to Edgewater, being a Subdivision in parts of Sections 5 and 6,
Township 40 North, Range 14, East of the Third Principal Meridian, in Cook
County, Illinois;

The real property commonly known as the Titus Haffa Building and legally
described as follows: Lot 4, in Edgewater Property One Subdivision, being a
Resubdivision of pan of Block 4, in Ashland Avenue and Clark Street Addition to
Edgewater, being a Subdivision in parts of Sections 5 and 6, Township 40 North,
Range 14, East of the Third Principal Meridian, in Cook County, Illinois; and

The real property commonly known as the Kadin Building and legally described
as follows: Lot 5, in Edgewater Property One Subdivision, being a
Resubdivision of part of Block 4, in Ashland Avenue and Clark Street Addition to
Edgewater, being a Subdivision in parts of Sections 5 and 6, Township 40 North,
Range 14, East of the Third Principal Meridian, in Cook County, Illinois.

94. The property that Rogan retained through PGR was:

West Rosehill Drive and North Clark Street Parking Lot ("Rosehill Parking Lot"):
Lots 8, 9, and 10 (except that part conveyed to the City of Chicago for widening
streets by deeds recorded as Document Numbers 9225038 and 9225039) and Lots
11, 12, 13, 14, and 15 and the vacated alley lying East and adjoining Lot 11 and
West and adjoining Lots 8 through 10 in the Resubdivision of Block 7 in Barren
and Galloway's Resubdivision of Blocks 7, 8 and 9 in Henry Town in the East $^1/_2$
of the Southeast $^1/_4$ of Section 6, Township 40 North, Range 14, East of the Third
Principal Meridian, in Cook County, Illinois.

West Edgewater Avenue and North Ashland Avenue Parking Lot ("Edgewater
Parking Lot"): PARCEL 1: The south 100 feet of the North 278.52 feet of the
East 246.95 feet of the Southeast ½ of the Southeast ¼ of Section 6, Township 40
North, Range 14 East of the Third Principal Meridian (except alleys and that part
taken for widening of North Clark Street), in Cook County, Illinois.

PARCEL 2: Lots 1, 2, 3, 4 and 5 (except that part taken by or conveyed to the
City of Chicago for Street Purposes) in Block 3 in Ashland Avenue and Clark

Street Addition to Edgewater, being a Subdivision in parts of Section 5 and 6 Township 40 North, Range 14 East of the Third Principal Meridian, in Cook County, Illinois.

95. The Defendants approved and ratified expenditures in connection with construction projects and building developments designed intentionally to make the operation of Debtor highly dependent upon the buildings and other real property adjacent to Debtor, which Rogan owned through EPC and PGR. For example, the Access and Vital Boards allowed air conditioning and telephone facilities for Edgewater to be installed on or in the nearby buildings, in which Rogan and EPC held a personal interest. The Boards also caused Debtor to fund and/or arrange improvements to certain buildings and parking lots that Rogan and PGR owned and attached or in close proximity to Edgewater's buildings. These improvements had the intent and effect of increasing the future value of the real property that Rogan, EPC and PGR owned, all to the detriment of the financial value, health and well-being of Debtor.

96. Rogan, EPC and PGR allowed Debtor to use the property Rogan, EPC and PGR owned rent-free from the time of the sale in 1994 until 1996, when the Board approved and caused approved a lease agreement between Edgewater and EPC dated January 1, 1996.

97. Under the lease, the base rent began at $954,000 the first year and was subject to a 4% to 10% increase each subsequent calendar year. The lease also required Debtor to pay the property taxes and insurance on EPC's real property. In addition to rent for the period of use after the execution of the lease, the lease required Debtor to back pay rent in the amount of $288,000 for the period that occurred between the sale of the hospital until the effective date of the lease.

98. The rents that Debtor paid to Rogan and EPC, and other expenses that Debtor incurred, pursuant to the lease for Edgewater's use of the EPC Property were exorbitant relative to the fair market value and the rental value of the EPC Property. Upon information and belief, the Board conducted no independent inquiry regarding the reasonableness of terms and rents proposed under the EPC lease agreement, and relied exclusively on information provided by Bainbridge, Braddock, Rogan and/or consultants engaged by Rogan, prior to approving the terms of the EPC lease.

99. The Board caused or ratified the payment of property taxes and other expenses relating to the parking lots, which belonged to PGR, listed above.

100.    On or about August 17, 1994, EPC executed an exclusive option agreement and right of first refusal (the "Option") with Debtor. The Option gave Debtor the contractual right to purchase the EPC property that Rogan and EPC owned at any time before 5:00 p.m. on December 31, 1998 at a price agreed upon by the parties or set by a qualified appraiser. The Option also granted Debtor the right of first refusal to purchase the EPC property, if at any time before the Option expired, EPC wished to accept a bona fide offer to purchase the property from a third party. This Option was reiterated in the 1996 lease between Debtor and EPC.

Option

101.    On or before December 31, 1998, the Defendants serving on the Northside Board made the determination that it would not exercise the Option to purchase the PGR properties described inter alia. Upon information and belief, the Defendants knew that their action would financially disadvantage Debtor, while personally benefiting Defendant Rogan and enterprises in which Defendant Rogan held a personal interest.

34

102.   On or about August 17, 1994, for and in consideration for the EOC-Edgewater merger described above, Rogan, as President of EPC, and Edgewater executed an Exclusive Option Agreement and Right of First Refusal (the "Option") with Edgewater. The Option gave Edgewater a contractual right to purchase the EPC Property from Rogan and EPC at any time before 5:00 p.m. on December 31, 1998 at a price agreed upon by the parties or set by a qualified appraiser. The Option also granted Edgewater the right of first refusal to purchase the EPC Property, if at any time before the Option expired EPC wished to accept a bona fide offer to purchase the property from a third party.

103.   The 1996 lease between Edgewater and EPC reiterated and expressly incorporated this Option into the lease. The 1996 lease provided that the lease would be subject to cancellation upon the close of any sale of all of the EPC Property to Edgewater pursuant to the Option, and that rent would be paid until, but not after, the closing date of the purchase (but not after the closing date).

104.   Prior to its expiration at 5:00 pm on December 31, 1998, Rogan (acting for EPC's benefit) and EPC intentionally and recklessly caused Edgewater to fail to exercise the Option. In doing so, Rogan and EPC:  (a) knew and had reason to know that their action would financially disadvantage Edgewater and its creditors, and personally benefit Rogan, EPC, and enterprises in which Rogan held a personal interest; and (b) breached the Option contract and their duty of good faith and fair dealing thereunder by preventing Edgewater from exercising its right to purchase the EPC Property under the terms of the Option.

105.   During the period between the initiation of the lease and the expiration of the Option, Edgewater had adequate capital and access to capital to purchase the EPC Property at a

35

fair market price. Indeed, less than a year after the expiration of the Option, Rogan caused

Edgewater to invest $10,000,000 of its own funds to acquire Grant Hospital ("Grant"), a

hospital several miles away from the Edgewater campus. At the time of the Grant acquisition,

Rogan knew or had reason to know that Grant was in weak financial condition and that

Edgewater would have to make substantial additional financial loans to Grant to assist in its

operations. (Ultimately, during the 1999-2001 time period, Edgewater loaned Grant

approximately an additional $17.3 million in operating funds.) Accordingly, Rogan caused

Edgewater to forego the acquisition of property necessary to allow Edgewater to own the entire

campus necessary for its operation and to avoid very large lease payments, but shortly thereafter

caused Edgewater to spend over $27,000,000 acquiring and operating a financially troubled

hospital, wholly unrelated to Edgewater.

106. During the period between the initiation of the lease and the expiration of the

Option, Edgewater financial personnel received substantial offers from at least one financial

institution to finance the purchase of the EPC Properties under the Option on a 20/80

basis.Upon information and belief, EPC gave little or no consideration to Edgewater in

exchange for Edgewater's relinquishment of its right to purchase the EPC Property under the

terms of the Option.

107. In or about December 1995, within the Option period and immediately prior to the

commencement of the lease, Rogan obtained purported appraisals of the EPC property.

According the appraisals, the EPC property had a fair market value between $5,620,000 and

$7,880,000.

108.   By the time the Option expired, just two years after the lease became effective, Edgewater had already paid Rogan and EPC more than approximately $2,063,692.80 in rent. Furthermore, during this same period, Edgewater made substantial additional payments allegedly under the lease that benefited Rogan and EPC, including real estate taxes and other payments in excess of approximately $1,921,97.40.

109.   From the expiration of the Option on or about December 31, 1998 until in or about March 2001, Edgewater paid Rogan and EPC at least $2,514,222.58 in rent.  Furthermore, during this same period, Edgewater made substantial additional payments allegedly under the lease that benefited Rogan and EPC, including real estate taxes of an amount not less than $293,806.36 and other payments.

110.   In or about March 2001, Edgewater ceased making rental payments to Rogan and EPC.

111.   As a result of substantial pressure from Edgewater's primary financier, Dexia Crédit Local ("Dexia"), Vital finally terminated Rogan and Bainbridge in or about May 2001. Rogan and EPC immediately began to demand payment upon the rent allegedly due Rogan and EPC under the lease.  Thereafter, Rogan and EPC brought a forcible entry and detainer action in the Circuit Court of Cook County against Edgewater to obtain possession of and back rent for the EPC properties.  In compliance with a court order in the forcible entry and detainer action, Edgewater paid $435,008 (plus the interest accrued on the funds) to the Clerk of the Circuit Court of Cook County, Illinois (the "Clerk") to be held in escrow by the court until the resolution of issues related to Edgewater's interest in the EPC Property.  A list of these payments is attached hereto as Exhibit D.  During the transition period of counsel after the

appointment of a custodian for Edgewater, a miscommunication led to the failure of prior

counsel of Edgewater to appear on that matter and a default judgment to be entered. Edgewater

filed its petition in this bankruptcy action prior to the conclusion of the set aside period under

735 ILCS 5/2-1301(e), and a stay was entered. Thereafter, this Court ordered the Clerk to

turnover the $435,008 to the custodian of Edgewater to be held in a separate account until the

resolution of the issues in this bankruptcy.

112.    Accordingly, as of February 25, 2002, the filing date of the petition in this case,

Edgewater has paid at least $3,460,081.78 allegedly under the lease either to or for the benefit of

Rogan and EPC. Thus, prior to the filing date of the petition, Edgewater ultimately paid

purportedly under the lease all or a substantial percentage of the fair market value of the EPC

property to or for the benefit of Rogan and EPC.

113.    The Defendants violated their duty of care and loyalty by approving and/or

ratifying Rogan's actions and the terms of the EPC lease. Upon information and belief, the

Defendants approved and/or ratified the EPC lease without reviewing or being provided a copy

of its terms. The Defendants also approved and/or ratified the EPC lease without obtaining

independent advice and counsel regarding the fairness of the terms of the lease from persons

unaffiliated with Rogan. The Defendants likewise violated their duty of care, good faith, and

loyalty by allowing the Option on the EPC property to expire unexercised, for the benefit of

Peter Rogan and EPC, and to the detriment of Debtor.

114.    Upon information and belief, Debtor engaged in additional transactions with

Rogan and/or Rogan affiliated entities that have not yet been uncovered because the Board did

not adopt adequate internal controls and policies regarding interested party transactions and

failed to enforce those policies with respect to entities and persons under Rogan's direct or indirect control.

115.    The foregoing transactions set forth above, and other transactions with Rogan and/or Rogan affiliated entities that have yet to be uncovered, were on terms, conditions and prices that were not fair to Debtor.

116.    Because the Defendants did not and could not exercise good faith, independent judgment with respect to the transactions involving Rogan and his affiliated companies, and because the transactions were not fair to Debtor, the Defendants violated their duties of care, good faith, loyalty, and fair dealing.  All payments made on behalf of Debtor as a result of the Defendants' breaches of duty are ultra vires, corporate waste, and constitute gross mismanagement of Debtor's assets and properties.

117.    The Defendants' conduct in approving these transactions was willful and wanton. The Defendants knew that Debtor was a non-profit corporation, charged with a public trust, and responsible for complying with rules and regulations which limit the compensation that may be paid to its managers.  By approving, permitting and ratifying substantial transfers of assets for no consideration, and excessive payments for unnecessary, duplicative or fictional services to Rogan and affilated companies, the Defendants knowingly and intentionally disregarded a serious risk of injury to the property and estate of Debtor.

Interference with Independent Professionals

118.    In or around October 1996, Debtor's independent auditors, Ernst & Young, requested, as part of its annual audit, information about the CHA investigation and affiliations between Debtor, Rogan's management companies, and other entities.  At a special meeting of

the Board in or about October 1996, Rogan recommended that Ernst & Young be terminated,

stating that E&Y wanted to know too much about the CHA investigation and the corporate

affiliations between Debtor and other companies with whom Rogan had dealings. Upon

Rogan's recommendation, Debtor's Board discharged Ernst & Young. The Board's reliance on

the representations of the management companies, its failure to make additional independent

inquiry, and its failure to take action against the management companies at that time was

unreasonable, insofar as the Board knew or should have known that Rogan wanted Ernst &

Young fired so he could conceal evidence of misconduct at the CHA and other acts of self-

dealing.

119.    Additional evidence of misconduct, self-dealing and potential fraud was brought

the Board's attention when, a mere three years later, in late 1999, Debtor's new auditors,

Coopers & Lybrand, resigned and declined to opine on Debtor's financial statements for the

year 2000.

120.    In a letter to the Permian and Northside Boards, Coopers stated that its resignation

was, in part, because management had not been candid in disclosing a $10 million loan and/or

gift to a company affiliated with Debtor. Coopers also advised that its resignation was, in part,

because management had terminated work that Coopers had been performing to analyze the

reasonableness of the management companies' fees. Coopers stated that management had

purported to discharge the firm after management received Coopers' preliminary view that the

fees that Bainbridge/Braddock charged Debtor were among the highest of all hospitals sampled.

121.    Upon information and belief, the Board did not conduct an independent

investigation of the matters set forth in the Coopers resignation letter, relying instead upon

40

cursory explanations given by Rogan and other persons working on his behalf. Based on the

facts and circumstances known to the Defendants at the time, including, but not limited to, the

discharge or resignation of two independent accounting firms within three years for issues

relating to management candor and self-dealing, Debtor Board's continued reliance on the

representations of management, their failure to conduct additional independent inquiry, and their

failure to take action with respect to the management companies was unreasonable.

122.   Until in or about 2000, Debtor's financial statements were audited annually by an

independent accounting firm engaged by the company for that purpose. However, in about

2000, the Defendants, upon the recommendation of Peter Rogan, suspended audit work being

performed by McGladrey & Pullen, the company's then-auditors, so that an adverse audit

opinion would not issue. The Defendants' deliberate decision to delay the audit of Debtor's

financial statements was willful and wanton misconduct based on the facts known to them at the

time, including their awareness of potential criminal conduct at Debtor that would necessarily

cause the company's financial statements to become false and misleading, and their awareness

that the company's interim financial statements were regularly distributed and relied upon by

the company's creditors, including Dexia Credit Local ("Dexia").

123.   For weeks and months prior to May 2001, when the Defendants terminated

Bainbridge and Braddock, Defendants received repeated advice from its counsel for criminal

matters, David Stetler, and corporate counsel, McDermott Will & Emery, to discharge the

management companies and Mr. Rogan. However, Defendants disregarded this advice, going

so far as to "retract" a determination that Rogan and the management companies be discharged,

only to reinstate that determination only after counsel threatened to immediately resign.

Indeed, on May 9, 2000, counsel advised the Access and Vital Boards, via e-mail, that "neither

the US Attorney nor Dexia believes that the Board is independent, and at every opportunity to prove them wrong, the Board has taken the cowardly course of protecting Bainbridge rather than your charitable trust." Counsel also made clear that "if you don't want McDermott's advice, you'd better get a lawyer to whom you will listen. Peter doesn't listen to his lawyers; this Board doesn't listen to its lawyers. The parallels are uncanny."

Failure to Protect and Preserve Debtor's Assets

124.    Upon information and belief, no later than 1999, Debtor's books of account showed increasing losses and cash depletion. However, rather than conserving cash and looking for strategic options to maximize the value of Debtor's assets for itself and creditors (including, among other things, sale of the Hospital or a petition for relief under the bankruptcy code), the management companies and Rogan continued to squander Debtor's assets through, among other things, unnecessary capital projects and large transfers of cash to to affiliates. The Defendants allowed, approved and/or ratified these transactions, further weakening Edgewater's financial position. These actions were taken at the direction of Peter Rogan, and substantially depleted Debtor' assets.

125.    The Defendants also failed to pursue repayment of millions in cash, real estate, uncollected loans, accounts receivable, and potential legal claims that Debtor was or is owed by numerous parties. These potential claims include, but are not limited to, the $10 million loan to Vista, an affiliate of a company that one of Rogan's former business associates owned/controlled. Both Debtor's purported forgiveness of $4 million of this loan in 1998, and its failure, throughout the time relevant to this case, to make any efforts to pursue repayment of the remaining $6 million on the note, constitutes a breach of fiduciary duty on the part of the Defendants.

126.    The Defendants have failed to seek repayment of a $3 million paid by Debtor to CSSF, an affiliated company directly or indirectly controlled by Rogan. Upon information and belief, CSSF has retained approximately $2 million in cash from this initial transfer. Upon information and belief, CSSF did little to perform its original mission prior to Edgewater's insolvency. Thus, CSSF did not spend the money transferred to it in any way that benefited Edgewater. The Defendants also failed to seek repayment for funds transferred to other affiliated entities, including CMA, and Hispanic Physicians Network.

127.    The Defendants also failed to initiate timely legal action against the management companies, Ehman or Rogan for the health care frauds detailed in this Complaint, including, but not limited to claims for recoupment of the millions of dollars in management fees and disbursements paid to the management companies and Rogan personally during the period they controlled Debtor and used it as a vehicle for crime and fraud. The management agreements each contain indemnification provisions requiring the management companies to indemnify Access and Vital and Edgewater for damage done to Access and Vital. However, the Defendants took no action to seek recovery of such sums. Access and Vital have not even filed counterclaims in any of the multiple actions that have commenced against Debtor and other affiliated entities for payment of management fees and lease payments for land that Rogan owns directly and through entities in which Rogan held a personal ownership interest, including, without limitation, EPC and PGR. Upon information and belief, although legal action would have inurred to the benefit of Debtor, Defendants chose not to pursue claims due to their extensive and long-standing conflicts of interest with respect to Peter Rogan.

128.    Upon information and belief, the Defendants' failure to take prompt legal action against the management companies and persons acting on their behalf has resulted in serious

and irreparable injury to Debtor. Upon information and belief, documents and computers belonging to persons associated with the management companies have been removed or destroyed, compromising Debtor's legal claims. Upon information and belief, the management companies, Peter Rogan and others involved in wrongdoing have also engaged in the transfer, dissipation and/or concealment of assets, compromising Debtor's ability to collect on any judgment. The Defendants' failure to promptly pursue known claims against the management companies, Ehman and Rogan violated the Defendants' duty of care, loyalty and good faith, and constituted acts of gross mismanagement and corporate waste.

<u>Improper Transfers Causing or During Debtor's Slide into Bankruptcy</u>

129.    Within the four years prior to the Petition Date, Debtor transferred millions of dollars directly to Defendant Vital and for the benefit of Access, as the sole corporate member of Vital. These transfers include, but are not limited to, a transfer in or about March 2000 of Debtor's interest in Edgewater Grant Property Company, worth not less than $10,000,000. At that time, Debtor also transferred its other interests in Grant Hospital to Vital and for the benefit of Access.

130.    Within the four years prior to the Petition Date, Debtor transferred funds directly to many of the Defendants for, upon information and belief, compensation for their participation on the Board of Directors or various committees of Debtor, Access, or Vital; reimbursement of expenses for lavish vacations and other trips; and/or consulting or other services allegedly performed for Debtor. These transfers include, but are not limited to, the transfers listed in Exhibit A attached hereto. Many of these transfers occurred within one year of the bankruptcy filing.

131.    Defendants were all insiders of Debtor.  The Defendants maintained a sufficiently close relationship with Debtor that their conduct is made subject to closer scrutiny than entities whose dealings with Debtor were conducted at arms-length.  Specifically, Access and Vital controlled Debtor as its parent corporations.  As explained in detail herein, Defendants Bengston, Brewer, Chapas, Fruland, Mays, Mullen and Shanahan controlled Debtor through their participation on various boards and in the business operations of Debtor and those closely associated with Debtor.

132.    From well before a year prior to the Petition Date, Debtor and the Defendants were aware of the threat, direct or implicit, of criminal charges or civil suits that the federal government might bring against Debtor as a result of the government's investigation.  Debtor and the Defendants were also aware that suspension of Medicare and Medicaid payments would cause a huge proportion of Debtor's revenue stream to be lost.  Lastly, from well before a year prior to the Petition Date, Debtor and the Defendants were aware of Debtor's serious financial difficulties and rapidly eroding financial condition, including operating losses following and triggered by transfers to affiliates, and repeated and uncured violations of certain coverage ratios under Debtor's credit facilities.

133.    On November 1, 2001, Medicare and Medicaid ceased payments to Debtor.  A few days later, on or about November 6, 2001, Debtor defaulted under the terms of its bond documents Debtor to incur substantial debt.  Specifically, Debtor's bondholders tendered bonds with an approximate aggregate principal amount of $55,000,000 million.  This, in turn, obligated Dexia Credit Local to pay the purchase price of the tendered bonds under a letter of credit guarantee and Debtor became indebted to Dexia for not less than $55,000,000.  Dexia's letter of credit was secured by substantially all of Debtor's assets.

134.   The several indictments of Debtor's personnel and most significantly of Ehmen, Bainbridge, and Braddock led Medicare and Medicaid to freeze payments to Debtor in November 2001. This was the direct cause of Debtor's closure in December 2001 and its bankruptcy on February 25, 2002.

135.   Many of Debtor's creditors at the time of the Petition Date were creditors of Debtor throughout the entire time relevant to this Complaint, including, for example, Dexia Credit Local, which had a security interest in Debtor's assets, and Eilen Okaro, who had asserted a medical malpractice claim against Debtor.

## FIRST CAUSE OF ACTION

Breach of Fiduciary Duty
(Failure to Supervise)

136.   Debtor incorporates by reference and realleges the paragraphs above as though fully set forth herein.

137.   The Defendants are fiduciaries of Debtor and owed it the duty to conduct the business of Debtor loyally, faithfully, carefully, diligently and prudently. This cause of action is asserted based on the Defendants' acts in violation of Illinois and common law, which acts constitute breaches of fiduciary duty, gross mismanagement and waste of Debtor's corporate assets.

138.   The Defendants participated in the acts of mismanagement alleged herein, or acted in reckless disregard of the facts known to them, and failed to exercise due care to prevent Debtor from committing fraud and other criminal acts. The Defendants became aware, or should have become aware through reasonable inquiry, of the facts alleged herein including, among others, that Bainbridge, Braddock and its officers were involved in acts of fraud and self-

dealing.  The Defendants became aware, or should have become aware through reasonable inquiry and diligence, of the adverse facts alleged herein, but did nothing to correct them and thereby breached their duty of care, loyalty, accountability by failing to act as an ordinary prudent person would have acted in a like position.

139.    The Defendants are responsible for the gross mismanagement of Debtor in connection with its billing practices and other matters detailed herein, including, specifically, causing or permitting Debtor to violate the law with respect to Medicare/Medicaid payment practices, failing to investigate and respond appropriately with respect to doctors engaged in fraudulent billing practices, and failing to implement adequate safegaurds, investigation, consideration, or due diligence to prevent further violations.

140.    The criminal conduct and fraudulent scheme described herein resulted in medically unnecessary procedures, injury and death.  The Defendants knew or should have known that the criminal conduct by Bainbridge, Braddock, its officers, and doctors acting at their behest presented a serious risk of injury to persons and property.  The acts and omission by the Defendants detailed herein were willful and wanton, insofar as they resulted from an actual or deliberate intention to cause harm, or, if not intentional, showed an utter indifference to or a conscious disregard for the safety of others or their property.

141.    The Defendants' failure to supervise, monitor, act reasonably and promptly in response to the criminal conduct perpetrated by Bainbridge, Braddock, their officers and others the direct and proximate cause of Edgewater's demise.

142.    Debtor has been injured by reason of the Defendants' intentional breach and/or reckless disregard of their fiduciary duties to Debtor.  Debtor seeks an award of damages and other relief as herein set forth.

## SECOND CAUSE OF ACTION

### Breach of Fiduciary Duty
### (Affiliated Party Transactions)

143.    Debtor incorporates by reference and realleges the paragraphs above as though fully set forth herein.

144.    The Defendants are fiduciaries of Debtor and owed it the duty to conduct the business of Debtor loyally, faithfully, carefully, diligently and prudently.  This cause of action is asserted based on the Defendants' acts in violation of Illinois and common law, which acts constitute breaches of fiduciary duty, self-dealing and waste of Debtor's corporate assets.

145.    The Defendants approved, ratified or permitted to take effect numerous transactions between Debtor and companies affiliated with Peter Rogan or other persons and entities under his control.

146.    In approving such transactions, the Defendants breached their duties of care, loyalty and disclosure to Debtor, insofar as each of the Defendants suffered disabling conflicts of interest that were not disclosed at the time such transactions were approved, and did not seek independent counsel or advice regarding the fairness of the transactions to Debtor.

147.    The affiliated party transactions were not fair to Debtor, and payments as part of the complained-of transactions would not have been made had the Defendants faithfully exercised their fiduciary obligations to Debtor.

148.    Payments pursuant to the complained-of transactions were ultra vires, corporate waste, and constituted gross mismanagement of Debtor's business.

149.    Because the Defendants knew or should have known that Debtor was insolvent but for the revenues generated by the fraud and criminal acts perpretrated by Bainbridge, Braddock and its officers, the Defendants' acts or omissions in approving the transfer or

payment of millions in Debtor's assets consituted willful and wanton conduct and presented a

serious risk of injury to the business and property of Debtor and others.

150.    Debtor has been injured by reason of the Defendants' intentional breach and/or

reckless disregard of their fiduciary duties to Debtor.  Debtor seeks an award of damages and

other relief as herein set forth.

## THIRD CAUSE OF ACTION

Breach of Fiduciary Duty
(Gross Mismanagement and Corporate Waste)

151.    Debtor incorporates by reference and realleges the paragraphs above as though

fully set forth herein.

152.    The Defendants are fiduciaries of Debtor and owed it the duty to conduct the

business of Debtor loyally, faithfully, carefully, diligently and prudently.  This cause of action is

asserted based on the Defendants' acts in violation of Illinois and common law, which acts

constitute breaches of fiduciary duty, gross mismanagement, and waste of Debtor's corporate

assets. Debtor incorporates by reference and realleges paragraphs above as though fully set forth

herein.

153.    By failing to pursue prompt legal action against the persons and entities identified

herein, and by ratifying and/or approving transactions that caused the dissipation of Debtor's

assets, the Defendants breached their duties of care, loyalty and good faith to Debtor.

154.    Debtor has been injured by reason of the Defendants' intentional breach and/or

reckless disregard of their fiduciary duties to Debtor.  Debtor seeks an award of damages and

other relief as herein set forth.

## FOURTH CAUSE OF ACTION

Aiding and Abetting Breach of Fiduciary Duty

155.   Debtor incorporates by reference and realleges the paragraphs above as though fully set forth herein.

156.   Each of the members of the Board of Directors of Northside, Access, and Vital (and the committees constituted thereunder) owed fiduciary obligations to Debtor.  Access and Vital, as Debtor's direct and ultimate parent corporations, likewise owed Debtor fiduciary obligations.  As agents of Debtor, and pursuant to the express terms of the management agreements they entered into with Debtor, Bainbridge, Braddock and its officers and agents, including Peter Rogan and Roger Ehman, likewise owed Debtor fiduciary obligations.  The acts and omissions detailed herein constitute breaches of fidiciary duty with respect to all such persons.

157.   Each of the Defendants pursued a common course of conduct, acted with, conspired with and/or aided and abetted one another to accomplish the violations of fiduciary duties complained of herein.  The conspiracy, common enterprise and common course of conduct commenced by at least 1996, and involved each of the Defendants during their time of service on the Boards of Northside, Vital, and Access.  The purpose and effect of the conspiracy, common enterprise and common course of conduct was, inter alia, to support and facilitate the business interests of Peter Rogan and entities and persons affiliated with him, allowing them to increase and protect their own private business dealings and personal relationships with him.  Each Defendant was a direct, necessary and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.