158.    Each of the Defendants named herein aided and abetted and rendered substantial assistance to the others' violation of fiduciary duties.  In taking the actions to aid and abet and substantially assist the violations of fiduciary duties complained of, each defendant acted with an awareness of the wrongdoing and realized that his or her conduct would and did substantially assist the violations complained of herein.

159.    As members of the Boards of Northside, Vital and Access, or committees constituted thereunder, the Defendants were directly responsible for failing to undertake proper due diligence and/or investigation into the criminal conduct, fraud, and acts of self-dealing by Bainbridge, Braddock, and its officers.  Each of the Defendants is liable as a direct participant in, an aider and abettor of, and/or co-conspirator with respect to the violation of fiduciary duties and had the power and influence to cause, and did cause, Debtor to engage in the conduct complained of herein.

## FIFTH CAUSE OF ACTION

### Avoidance and Recovery of Fraudulent Transfer – Actual Fraud

(740 ILCS 160/5(a)(1))

160.    Debtor realleges and incorporates the preceding paragraphs of this Complaint as though fully set forth herein.

161.    Pursuant to 11 U.S.C. § 544, Debtor is entitled to assert claims under the Illinois Uniform Fraudulent Transfer Act.

162.    Within four years of the Petition Date, Debtor transferred money and other assets to Defendant Vital and for the benefit of Defendant Access, as Vital's sole coporate member. These transfers include, but are not limited to, a transfer of Debtor's interest in Edgewater Grant Property Company, worth not less than $10,000,000 at the time of the transfer in or about 2000.

51

At that time, Debtor also transferred its other interests in Grant Hospital to Vital and for the

benefit of Access. Debtor made the foregoing transfers with the actual intent to hinder, delay, or

defraud its creditors. As described in detail above, (a) Access and Vital were insiders of Debtor;

(b) Debtor received little or no consideration for the transfers or the consideration received was

not reasonably equivalent to the value of the assets transferred; (c) Debtor was insolvent or

became insolvent shortly after the transfers; (d) the transfers occurred shortly before or shortly

after Debtor incurred a substantial debt; (e) before or shortly after the transfers were made,

Debtor had been threatened with suit; and (f) after the transfer, Debtor retained control of the

property transferred through its insider relationship with Access and Vital, which controlled

both Debtor and Grant Hospital.

163.    The transfers were made within four years of the Petition Date.

164.    The transfers and insider transfers should be avoided pursuant to 740 ILCS

160/5(a)(1) and §544(b) of the Bankruptcy Code, and should be recovered by Debtor for the

benefit of its estate and its creditors pursuant to

<u>SIXTH CAUSE OF ACTION</u>

**Avoidance and Recovery of Preferential Transfer**

**(11 U.S.C. §§ 547(b)(4)(A) & (B) and 550)**

1.      Debtor realleges and incorporates the preceding paragraphs of this

Complaint as though fully set forth herein.

2.      Defendants Bengston, Brewer, Chapas, Fruland, Mays, Mullen and

Shanahan are insiders of Debtor within the meaning of §101(31) of the Bankruptcy Code.

3.      Within one year before the Petition Date, Debtor made transfers to or for

the benefit of Bengston, Brewer, Chapas, Fruland, Mays, Mullen and Shanahan.  The payments

include, but are not limited to, payments listed in Exhibit A attached hereto.

4.      Each of the transfers constituted a transfer of an interest of Debtor in

property within the meaning of §101(54) of the Bankruptcy Code and relevant case law.

5.      Because Debtor was allegedly reimbursing the Defendants for their

services and expenses, Bengston, Brewer, Chapas, Fruland, Mays, Mullen and Shanahan were

creditors of Debtor at the time each of the transfers was made within the meaning of §101(10)(A)

of the Bankruptcy Code.

6.      The transfers were made for or on account of an antecedent due under

policies and procedures established by the Board of Directors to reimburse members of the

boards and committees for their services and expenses.

7.      The transfers were made while Debtor was insolvent or was presumed to

be insolvent within the meaning of § 101(32) of the Bankruptcy Code.

8.      Each of the transfers was made within one year of the Petition Date.

9.      The transfers enabled Bengston, Brewer, Chapas, Fruland, Mays, Mullen

and Shanahan to receive more than they would have received if (a) this case was a case under

Chapter 7 of the Bankruptcy Code, (b) the transfers had not been made, and (c) Bengston,

Brewer, Chapas, Fruland, Mays, Mullen and Shanahan received payment of their debt to the

extent provided by the provisions of the Bankruptcy Code.

53

10.    The transfers are avoidable as preferential transfers within the meaning of § 547(b) of the Bankruptcy Code and should be recovered by Debtor for the benefit of the estate and its creditors pursuant to § 550(a) of the Bankruptcy Code.

<u>SEVENTH CAUSE OF ACTION</u>

**Disallowance of Claims**

**(11 U.S.C. § 502(d))**

11.    Debtor realleges and incorporates the preceding paragraphs of this Complaint as though fully set forth herein.

12.    Pursuant to § 502(d) of the Bankruptcy Code, the court shall disallow any claim of any entity from which property is recoverable under §§ 542, 543, 550 or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under §§ 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under §§ 522(i), 542, 543, 550 or 553 of the Bankruptcy Code.

13.    Because Defendants Access, Vital, Bengston, Brewer, Chapas, Fruland, Mays, Mullen, and Shanahan have not turned the preferential transfers avoidable under §547 of the Bankruptcy Code and recoverable under § 550 of the Bankruptcy Code and fraudulent transfers avoidable under §§ 544 and 548 of the Bankruptcy Code and recoverable under § 550 of the Bankruptcy Code over to Debtor, the Court must disallow under § 502(d) of the Bankruptcy Code any claims of Defendants Access, Vital, Bengston, Brewer, Chapas, Fruland, Mays, Mullen, and Shanahan they pay to Debtor the value of the preferential and fraudulent transfers.

54

## PRAYER FOR RELIEF

WHEREFORE, Debtor demands judgment as follows:

A.      Against each Defendant for damages in favor of Debtor, and an award of punitive and exemplary damages as appropriate, plus prejudgment interest;

B.      Avoidance of transfers, and recovery from Defendants Access and Vital, for the benefit of the estate, the value of the property transferred to or for the benefit of Access and Vital under 11 U.S.C. § 550;

C.      Avoidance of transfers, and recover from Defendants Bengston, Brewer, Chapas, Fruland, Mays, Mullen and Shanahan for the benefit of the estate of the value of the property transferred to or for the benefit of under 11 U.S.C. § 550;

D.      Disallowing any claims of the Defendants Access, Vital, Bengston, Brewer, Chapas, Fruland, Mays, Mullen, and Shanahan against Debtor pursuant to § 502(d) of the Bankruptcy Code; and

E.      Extraordinary equitable relief as appropriate so as to assure that Debtor has an effective remedy;

F.      An award of costs associated with this action, including reasonable attorneys', accountants', and experts' fees; and

G.      An award of such other relief as this Court may deem just and proper.


Dated: April 23, 2004

Respectfully submitted,


_____
One of the Attorneys for
Debtor in Possession
EDGEWATER MEDICAL CENTER

Scott Mendeloff
R. Rene Pengra
Gabriel Aizenberg
Eric Pruitt
Shelly DeRousse
SIDLEY AUSTIN BROWN & WOOD LLP
Bank One Plaze
10 South Dearborn Street
Chicago, IL 60603
312.853.7000 (phone)
312.853.7036 (fax)

# **EXHIBIT A**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

JAN 1 5 2003

Judge Suzanne B. Conlon
United States District Court

UNITED STATES OF AMERICA )
)
v. )   No. 01 CR 469·%
)   Judge Suzanne B. Conlon
BRADDOCK MANAGEMENT L.P. )

## PLEA AGREEMENT

This Plea Agreement between the United States Attorney for
the Northern District of Illinois, PATRICK J. FITZGERALD, and the
defendant, BRADDOCK MANAGEMENT L.P., and its attorney, JAMES R.
STREICKER, is made pursuant to Rule 11 of the Federal Rules of
Criminal Procedure.

This Plea Agreement is entirely voluntary and represents the
entire agreement between the United States Attorney and defendant
regarding defendant's criminal liability in the above-captioned
case.

This Plea Agreement concerns criminal liability only, and
nothing herein shall limit or in any way waive or release any
administrative or judicial civil claim, demand or cause of
action, whatsoever, of the United States or its agencies, except
as explicitly set forth herein.   Moreover, this Agreement is
limited to the United States Attorney's Office for the Northern
District of Illinois and cannot bind any other federal, state or

1

local prosecuting, administrative or regulatory authorities or agencies except as expressly set forth in this Agreement.

By this Plea Agreement, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, and the defendant, BRADDOCK MANAGEMENT L.P., and its attorney, JAMES R. STREICKER, have agreed upon the following:

1. Defendant acknowledges that it has been charged in the second superseding information in this case with health care fraud, in violation of 18 U.S.C. § 1347.

2. Defendant has read the charge against it contained in the second superseding information in this case and that charge has been fully explained to it by its attorney.

3. Defendant fully understands the nature and elements of the crime with which it has been charged.

4. Defendant will enter a voluntary plea of guilty to Count 1 of the second superseding information in this case.

5. Defendant will plead guilty because it is in fact guilty of the charge contained in Count 1 of the second superseding information in this case. In pleading guilty, defendant admits the following facts and that those facts establish its guilt beyond a reasonable doubt. The following is not a complete statement of all the details known to the defendant regarding the defendant's criminal conduct. The

2

following facts are set forth solely as a factual basis for this

guilty plea.  Defendant Braddock Management L.P. admits that:

### Background

At times material herein:

Edgewater Medical Center ("Edgewater" or "Edgewater

Hospital"), an Illinois not for profit corporation, was a

hospital located at 5700 North Ashland Avenue, Chicago, Illinois.

Edgewater was an authorized Medicare and Medicaid provider.

Braddock Management L.P. ("Braddock") was a limited

liability partnership that had management contracts with

Edgewater beginning no later than in or about 1995 and continuing

until in or about March 2000.

Bainbridge Management L.P. ("Bainbridge") was a limited

liability partnership that had management contracts with

Edgewater from in or about March 2000 and continuing until

approximately May 2001.

Bainbridge Management, Inc., or one of its predecessors, was

the general partner of both Braddock and Bainbridge.

The management contracts between Braddock and Edgewater

provided that Braddock would act as the exclusive manager of the

day-to-day operations of Edgewater, and that Braddock would

supervise and manage all billings, collections, cost reporting

and other financial matters related to the day-to-day operation
of the hospital.   In or about March 2000, Bainbridge succeeded
Braddock in connection with the Edgewater management contracts,
and thereafter had the same rights and responsibilities under the
management contracts as had Braddock.

Beginning prior to 1995 and continuing at least until the
end of 2000, Roger Ehmen was a senior administrator at Edgewater
Hospital.   He held various titles.   At the end of his tenure,
Ehmen was the Senior Vice President for Edgewater Hospital.   He
was one of the key administrators at the hospital.   Ehmen had
significant responsibilities, which included recruiting doctors
for Edgewater's medical staff, signing physicians' contracts and
other documents on behalf of the hospital, and handling certain
complaints from doctors and staff.   Ehmen also was responsible
for maintaining and increasing the number of patients admitted to
the hospital.   Physicians and others reported directly to Ehmen
concerning certain matters.   During the time period that Braddock
had the Edgewater management contract, Ehmen was employed by
Braddock and was an agent of Braddock in connection with his
activities at Edgewater.   During the time period that Bainbridge
had the Edgewater management contract, Ehmen was employed by

4

Bainbridge and was an agent of Bainbridge in connection with his activities at Edgewater.

Medicare was a health care benefit program as defined in 18 U.S.C. § 24. Medicare ordinarily authorized payment for physician and hospital services only if those services were "medically necessary," that is, services required because of disease, disability, infirmity or impairment. Medicare would not pay for services and treatment if the patient did not meet criteria which indicated that the patient needed the relevant services and treatment. In addition, Medicare would not pay for services provided as a result of referrals that violated 42 U.S.C. § 1320a-7b. That statute prohibited anyone from paying or receiving monies or otherwise providing or accepting a thing of value, directly or indirectly, in exchange for patient referrals where such payments were made knowingly and willfully. Medicare was administered by The Centers for Medicare and Medicaid Services or its predecessor ("CMS").

## The Scheme

Beginning no later than in or about 1995 and continuing until approximately December 2000, Ehmen, as a Senior Vice President of Edgewater and as an agent of Braddock and Bainbridge, together with others, devised and intended to devise,

5

and participated in a scheme to defraud and to obtain money and property from Medicare by means of materially false and fraudulent pretenses, representations and promises, which scheme is further described below.

The scheme to defraud Medicare included the following. Braddock and Bainbridge, through Ehmen, who was acting as the agent of Braddock and Bainbridge,[1] caused Edgewater to make payments to certain doctors and other individuals in exchange for patient referrals to Edgewater. These kickbacks were concealed by creating contracts and other mechanisms that created the false impression that the payments were for legitimate services. The individuals to whom Braddock and Bainbridge, through Ehmen, caused Edgewater to pay kickbacks included Dr. Sheshquiri Rao Vavilikolanu ("Rao"), Dr. Kumar M. Kaliana ("Kumar"), Dr. Andrew Cubria, Dr. Ravi Barnabas and others.

Ehmen knew, among other things: (1) that these doctors and their associates were recruiting patients by giving patients cash

---

[1]     The government contends that others besides Ehmen acted as agents of Braddock and Bainbridge in connection with the misconduct described herein.  Defendant disagrees with the government's view of the evidence.  The parties agree, however, that Ehmen acted as an agent of Braddock and Bainbridge, and that, based on Ehmen's conduct, those entities are guilty as charged in the second superseding information.

or other benefits and promising that hospital services would cost
the patients nothing (i.e., that Medicare deductibles and co-
payments would be waived); (2) that these doctors and their
associates were coaching some patients to lie about their
physical condition and were lying to other patients about their
need for hospitalization; (3) that these doctors were admitting
patients to Edgewater who did not need to be admitted to the
hospital; (4) that these doctors were performing medically
unnecessary procedures and testing on certain patients; (5) that
these doctors were creating false records to justify and support
claims submitted to insurers, including false medical and
business records; (6) that these doctors and Edgewater were
submitting false and fraudulent claims to Medicare, in that the
claims fraudulently sought compensation for medically unnecessary
admissions, services, procedures and testing, and for services
rendered to patients who were referred to the hospital in
exchange for kickbacks. Ehmen, as an agent of Braddock and
Bainbridge, encouraged and assisted in these acts, and caused
them to happen.

Ehmen also caused Edgewater Hospital to submit Cost Reports
to Medicare, including for the years 1995 through 1998, that
falsely represented that services provided by Edgewater were

7

provided in compliance with the laws and regulations regarding the provision of health care services. This was false because, among other things, Edgewater was providing services to patients that were medically unnecessary and whose presence in the hospital was the result of the payment of kickbacks.

The kickbacks that Ehmen caused Edgewater to pay in return for admissions to Edgewater included the following.

### Payments To Rao And Kumar

In or about October 1996, Ehmen caused Edgewater to agree to pay monies to Rao, and to give Rao a contract to provide anesthesia services to Edgewater's patients, if Rao referred a substantial number of patients to the hospital for admission. In return, Rao agreed that he would try to admit to the hospital each month: (a) patients for medical treatment; and (b) patients for detoxification treatment.

In order to carry out the agreements made during the October 1996 meeting:

a. In or about April 1997, Ehmen caused Edgewater to give Rao's company, Rao, M.D., S.C., a contract, that enabled Rao to bill for all anesthesia services provided at the hospital, which contract was awarded to Rao in return for patient admissions.

8

b.  Between May 1997 and May 1998, Ehmen caused Edgewater to pay Rao's company, Rao, M.D., S.C., approximately $15,000 a month, totaling more than $200,000, in exchange for patient admissions.  Rao, with Ehmen's knowledge and consent, used a portion of those monies - in excess of $150,000 - to pay Kumar for the admission of patients for medical treatment, for which Rao received credit.

c.   On or about November 14, 1997, Ehmen caused Edgewater to give a contract to Rao's company, Florascribe, in order to conceal the fact that Edgewater was paying defendant Rao for patient referrals and admissions.

d. Between August 1997 and April 1998, Ehmen caused Edgewater to make approximately seven payments of $20,000 each to Rao's company, Florascribe, totaling approximately $140,000, in exchange for patient admissions.  Rao used a portion of those monies to pay patient recruiters for the admission of patients for detoxification ("detox") treatments.

### Payments to Cubria

For a period of years through at least December 2000, Ehmen caused Edgewater to pay monies exceeding $1,000,000 for television advertising that generated patients for Cubria's medical practice.  Ehmen caused these amounts to be paid so that

9

Cubria would maintain and/or increase the number of patients he admitted to Edgewater Hospital and to encourage Cubria to help Edgewater increase its revenues.

From approximately 1998 and through at least December 2000, Ehmen caused Edgewater to give a contract to Cubria to act as a medical director for the Cardiac Rehabilitation Program, with payments to Cubria of approximately $48,000 per year. Cubria performed little or no work under the contract. Ehmen caused Cubria to be paid these amounts so that he would maintain and/or increase the number of patients he admitted to Edgewater Hospital and to encourage Cubria to help Edgewater increase its revenues.

On or about February 28, 2000, at Chicago, defendant Braddock Management L.P. did knowingly and willfully execute and attempt to execute the scheme in connection with the delivery of and payment for health care benefits, items and services, in that on or about that date, defendant caused Medicare to pay Edgewater approximately $995 for services rendered at Edgewater by Dr. Cubria to patient R. All. as part of the scheme.

As a result of this scheme, Medicare and CMS were fraudulently billed and lost approximately $13,644,598.

10

6.      For purposes of applying the Guidelines promulgated by the United States Sentencing Commission pursuant to Title 28, United States Code, Section 994, the parties stipulate and agree on the following points:

a.   The November 1, 1998 Sentencing Guidelines Manual governs.  The applicable guideline is § 8A1.2.

b.   Restitution is authorized under 18 U.S.C. § 3663 and is mandatory under 18 U.S.C. § 3663A.  Therefore, pursuant to § 8B1.2(a)(1), the Court shall enter a restitution order for the full amount of the victim's loss, which in this case is $13,644,598.  This restitution obligation shall be joint and several with Bainbridge Management L.P.

c.   A remedial order pursuant to § 8B1.2 is not appropriate.

d.   Community service pursuant to § 8B1.3 is not appropriate.

e.   An order of notice to victims, pursuant to § 8B1.4 is not appropriate.

f.   A determination of the fine guideline is unnecessary and no fine is appropriate, pursuant to §§ 8C2.2(a) and 8C3.3(a), because it is readily ascertainable that the defendant cannot and is not likely to become able (even on an

11

installment schedule) to pay the restitution required under §
8B1.1.

g.   Because no fine is appropriate, a sentence of
probation is required, pursuant to § 8D1.1(a)(7).   Because the
offense of conviction is a felony, the term of probation shall be
at least one year but not more than five years, pursuant to §
8D1.2(a)(1).

h.   Based on the facts known to the government, the
defendant has no criminal history.

i.   The defendant and its attorney and the government
acknowledge that the above calculations are preliminary in nature
and based on facts known to the government as of the time of this
Agreement.   The defendant understands that the Probation
Department will conduct its own investigation and that the Court
ultimately determines the facts and law relevant to sentencing,
and that the Court's determinations govern the final Sentencing
Guidelines calculation.   Accordingly, the validity of this
Agreement is not contingent upon the probation officer s or the
Court's concurrence with the above calculations.

7.   Errors in calculations or interpretation of any of the
guidelines may be corrected by either party prior to sentencing.
The parties may correct these errors or misinterpretations either

by stipulation or by a statement to the probation office and/or court setting forth the disagreement as to the correct guidelines and their application.  The validity of this Agreement will not be affected by such corrections, and the defendant shall not have a right to withdraw its plea on the basis of such corrections.

8.  Defendant understands the count to which it will plead guilty carries the following maximum penalties: a term of probation of five years; a maximum fine of $500,000 or twice the gross gain or loss, whichever is greater; and any restitution ordered by the Court.

9.  The defendant understands that in accordance with federal law, Title 18, United States Code, Section 3013, upon entry of judgment of conviction, the defendant will be assessed $400 on the count to which it has pled guilty, in addition to any other penalty imposed.  The defendant agrees to pay the special assessment of $400 at the time of sentencing with a certified check or money order made payable to the Clerk of the U. S. District Court.

10. Defendant understands that by pleading guilty it surrenders certain rights, including the following:

(a) If defendant persisted in a plea of not guilty to the charges against it, it would have the right to a public and

13

speedy trial.  The trial could be either a jury trial or a trial by the judge sitting without a jury.  The defendant has a right to a jury trial.  However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

(b) If the trial is a jury trial, the jury would be composed of twelve layperson selected at random.  Defendant and its attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising so-called peremptory challenges.  The jury would have to agree unanimously before it could return a verdict of either guilty or not guilty.  The jury would be instructed that defendant is presumed innocent, and that it could not convict unless, after hearing all the evidence, and considering each count separately, it was persuaded of defendant's guilt beyond a reasonable doubt.

(c)  If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded of defendant's guilt beyond a reasonable doubt.

14

(d)   At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant.   Defendant would be able to confront those government witnesses and its attorney would be able to cross-examine them.   In turn, defendant could present witnesses and other evidence in its own behalf.   If the witnesses for defendant would not appear voluntarily, it could require their attendance through the subpoena power of the court.

(e)   Defendant understands that it has a right to have the charges prosecuted by an indictment returned by a concurrence of twelve or more members of a legally constituted grand jury consisting of not less than sixteen and not more than twenty-three members.   By signing this Agreement, defendant knowingly waives its right to be prosecuted by indictment and to assert at trial or on appeal any defects or errors arising from the second superseding information, the information process, or the fact that it has been prosecuted by means of information.

11.   Defendant understands that 18 U.S.C. § 3742 provides for appeal by a defendant of a sentence under certain circumstances, and that it may give up or waive said right to appeal.   Defendant also understands that under certain circumstances it has the right to attack its sentence in other

post-conviction proceedings. Defendant's attorneys have explained to the defendant its appellate rights, and its right to attack its guilty plea, conviction, and sentence in post-conviction proceedings, and the consequences of the waiver set forth in this paragraph. The defendant hereby expressly and knowingly waives and gives up any and all appellate rights conferred by § 3742 or by any other source whatsoever, in exchange for the concessions made by the United States in this Plea Agreement. The defendant also hereby expressly and knowingly waives and gives up any and all rights to attack its guilty plea, conviction, and sentence in any post-conviction proceeding, including the filing of a petition under 28 U.S.C. §§ 2255, 2241 or other post-conviction motion or petition. The waiver in this paragraph does not apply to a claim of involuntariness, or ineffective assistance of counsel, which relates directly to this waiver or to its negotiation. The defendant knowingly and voluntarily agrees to the terms of this paragraph.

12. Defendant understands that the indictment and this Plea Agreement are matters of public record and may be disclosed to anyone.

16

13. Nothing in this Agreement shall limit the Internal Revenue Service in its collection of any taxes, interest or penalties from the defendant.

14. Defendant understands that the United States Attorney's Office will fully apprise the District Court and the United States Probation Office of the nature, scope and extent of defendant's conduct regarding the charges against it in this case, and related matters, including all matters in aggravation and mitigation relevant to the issue of sentencing.

15. The parties agree that Braddock Management L.P., a limited liability partnership, is entering into this plea agreement pursuant to the directive of its general partner, Bainbridge Management, Inc., which directive has been authorized in a resolution by the Sole Director of Bainbridge Management, Inc. The parties agree that this resolution is sufficient authorization for Braddock Management L.P. to enter into this plea agreement.

16. Regarding restitution, defendant acknowledges that, pursuant to Title 18, United States Code, Section 3663A, the Court must order defendant to make restitution in the full amount due and owing, minus any credit for funds repaid prior to sentencing. The parties agree that the Court, at sentencing,

17

shall order defendant to pay restitution to The Centers for Medicare and Medicaid Services ("CMS") in the amount of $13,644,598, and that such restitution shall be due immediately. This restitution obligation shall be joint and several with Bainbridge Management L.P.

17.    Regarding a fine, the parties agree that no fine is appropriate.  Nonetheless, defendant understands that Section 8C of the Sentencing Guidelines sets forth the factors to be weighed in setting a fine, if any, and in determining the schedule, if any, according to which a fine is to be paid in this case.  The defendant agrees to provide full and truthful information to the Court, the United States Probation Office, and the United States Attorney's Office regarding all details of its economic circumstances in order to determine the proper fine and fine schedule, if any.  Defendant understands that providing false or incomplete information may be prosecuted as a violation of Title 18, United States Code, Section 1001, or as a contempt of the court, and would constitute a breach of this Plea Agreement.

18.    The parties agree that the economic circumstances of Braddock and Bainbridge are such that is extremely unlikely that the restitution ordered in this case will ever be paid by either defendant.  Braddock and Bainbridge have negotiated a compromise

18

regarding restitution with the victim, CMS, and the United States
Attorney's Office. Braddock and Bainbridge have agreed with the
United States Attorney's Office and CMS that any and all
restitution judgments entered by the Court will be fully
satisfied and compromised to $2.9 million. The parties agree
that, prior to the entry of a guilty plea by Braddock or
Bainbridge, funds in the amount of $2,900,000 will be deposited
into an attorney trust account with instructions that, upon the
District Court's entry of the an order implementing the
restitution compromise as described herein, the custodian of the
attorney trust account shall immediately deliver to the Clerk of
the United States District Court a certified check in the amount
of $2.9 million, which funds shall be applied toward the
satisfaction of any judgments entered in this case. Proof that
funds in the amount of $2,900,000 have been deposited into an
attorney trust account will be provided to the United States
Attorney's Office prior to the entry of a guilty plea by the
defendants.

19. At the time of sentencing, the parties agree to jointly
recommend: (a) that the Court impose a sentence of probation; (b)
that the Court impose no fine or penalty; (c) that the Court
order defendant to pay restitution to CMS, due immediately, in

19

the amount of $13,644,598, which obligation shall be joint and several with Bainbridge Management L.P.; (d) that the Court enter an order approving the negotiated restitution compromise and full satisfaction between Braddock, Bainbridge, CMS and the United States Attorney's Office; and (e) that the Court enter an order directing the custodian of the aforementioned attorney trust account to deliver immediately to the Clerk of the Court a certified check in the amount of $2.9 million which is to be applied to the negotiated restitution compromise.   On other aspects of the sentence, the parties shall be free to recommend whatever each deems appropriate.

20.   It is agreed by the parties that if the sentencing judge does not accept the recommendations of the parties set forth in Paragraph 19(b), 19(d) and 19(e), then (a) this Agreement shall become null and void and neither party will be bound thereto, (b) defendants will be entitled to withdraw their guilty pleas, and (c) the custodian of the attorney trust account for the $2.9 million escrowed pursuant to paragraph 18 of the Agreement will immediately return this $2.9 million to the depositor.   It is further agreed by the parties that, if the sentencing judge accepts the recommendations of the parties set forth in Paragraph 19(b), 19(d) and 19(e) and the custodian of

20

the aforementioned attorney trust account fails to deliver $2.9
million to the Clerk of the Court as described above, then this
Agreement shall become null and void and neither party will be
bound thereto.

21.  The United States agrees not to seek additional
criminal charges in the Northern District of Illinois against the
defendants or Bainbridge Management Inc. based on conduct now
known by the United States for the period from 1995 through 2001
that occurred in the Northern District of Illinois.   However,
nothing in this Agreement limits the United States in prosecution
of the defendants in other districts or for crimes not known to
the government at the time of this plea, except as expressly set
forth in this Agreement.

22.  After sentence has been imposed on the count to which
defendant pleads guilty as agreed herein, the government will
move to dismiss with prejudice the remaining counts as to this
defendant, as well as Bainbridge Management, Inc., in all
charging documents then on file with the Clerk in this criminal
case.  In addition, the government will move to dismiss defendant
and Bainbridge Management, Inc. from the civil case in this court
captioned United States of America v. Peter Rogan, Braddock

Management L.P, Bainbridge Management L.P. and Bainbridge
Management, Inc., Case No. 02 C 3310.

23. Defendant understands that its compliance with each
part of this Plea Agreement extends throughout and beyond the
period of its sentence, and failure to abide by any term of the
Plea Agreement is a violation of the Agreement. It further
understands that in the event it violates this Agreement, or if
the United States is unable to retain or obtain the financial
benefits of this Plea Agreement, the government, at its option,
may move to vacate the Plea Agreement, rendering it null and
void, and thereafter prosecute the defendant not subject to any
of the limits set forth in this Agreement, or to resentence the
defendant. The defendant understands and agrees that in the
event that the defendant's Plea is subsequently withdrawn,
vacated or breached by the defendant, and the Government elects
to void the Plea Agreement and prosecute the defendant, any
prosecutions that are not time-barred by the applicable statute
of limitations on the date of the signing of this Agreement may
be commenced against the defendant in accordance with this
paragraph, notwithstanding the expiration of the statute of
limitations between the signing of this Agreement and the
commencement of such prosecutions.

22

24. If the United States or its agencies are forced to give up any of the financial benefits of this Plea Agreement, whether as a result of a bankruptcy or otherwise, the parties agree: (a) that the $2.9 million compromised restitution judgment shall be reinstated and that the United States and its agencies shall be free to pursue any and all remedies to collect on that judgment from any party; and (b) that, in civil case 02 C 3310, the civil settlement agreement shall govern, pursuant to which, among other things, the government's civil claims in that case shall be reinstated.

25. Defendant and its attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

23

26. Defendant acknowledges that it has read this Agreement and carefully reviewed each provision with its attorney. Defendant further acknowledges that it understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: Jan. 15, 2003

PATRICK J. FITZGERALD
UNITED STATES ATTORNEY

BRADDOCK MANAGEMENT L.P.
Defendant

By
For its general partner
Bainbridge Management, Inc.

JACQUELINE STERN
Assistant United States Attorney

JAMES R. STREICKER
Attorney for Defendant

KAARINA SALOVAARA
Assistant United States Attorney

BAINBRIDGE MANAGEMENT, INC.

By

Its Attorney

24

# **EXHIBIT B**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

JAN 15 2003

Judge Suzanne B. Conlon
United States District Court

UNITED STATES OF AMERICA )
)
v. )          No. 01 CR 469-1
)          Judge Suzanne B. Conlon
BAINBRIDGE MANAGEMENT L.P. )

## PLEA AGREEMENT

This Plea Agreement between the United States Attorney for
the Northern District of Illinois, PATRICK J. FITZGERALD, and the
defendant, BAINBRIDGE MANAGEMENT L.P., and its attorney, VINCENT
J. CONNELLY, is made pursuant to Rule 11 of the Federal Rules of
Criminal Procedure.

This Plea Agreement is entirely voluntary and represents the
entire agreement between the United States Attorney and defendant
regarding defendant's criminal liability in the above-captioned
case.

This Plea Agreement concerns criminal liability only, and
nothing herein shall limit or in any way waive or release any
administrative or judicial civil claim, demand or cause of
action, whatsoever, of the United States or its agencies, except
as explicitly set forth herein.  Moreover, this Agreement is
limited to the United States Attorney's Office for the Northern
District of Illinois and cannot bind any other federal, state or

1



local prosecuting, administrative or regulatory authorities or agencies except as expressly set forth in this Agreement.

By this Plea Agreement, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, and the defendant, BAINBRIDGE MANAGEMENT L.P., and its attorney, VINCENT J. CONNELLY, have agreed upon the following:

1.   Defendant acknowledges that it has been charged in the second superseding information in this case with health care fraud, in violation of 18 U.S.C. § 1347.

2.   Defendant has read the charge against it contained in the second superseding information in this case and that charge has been fully explained to it by its attorney.

3.   Defendant fully understands the nature and elements of the crime with which it has been charged.

4.   Defendant will enter a voluntary plea of guilty to Count 2 of the second superseding information in this case.

5.   Defendant will plead guilty because it is in fact guilty of the charge contained in Count 2 of the second superseding information in this case.   In pleading guilty, defendant admits the following facts and that those facts establish its guilt beyond a reasonable doubt.   The following is not a complete statement of all the details known to the defendant regarding the defendant's criminal conduct.   The

following facts are set forth solely as a factual basis for this guilty plea. Defendant Bainbridge Management L.P. admits that:

### Background

At times material herein:

Edgewater Medical Center ("Edgewater" or "Edgewater Hospital"), an Illinois not for profit corporation, was a hospital located at 5700 North Ashland Avenue, Chicago, Illinois. Edgewater was an authorized Medicare and Medicaid provider.

Braddock Management L.P. ("Braddock") was a limited liability partnership that had management contracts with Edgewater beginning no later than in or about 1995 and continuing until in or about March 2000.

Bainbridge Management L.P. ("Bainbridge") was a limited liability partnership that had management contracts with Edgewater from in or about March 2000 and continuing until approximately May 2001.

Bainbridge Management, Inc., or one of its predecessors, was the general partner of both Braddock and Bainbridge.

The management contracts between Braddock and Edgewater provided that Braddock would act as the exclusive manager of the day-to-day operations of Edgewater, and that Braddock would supervise and manage all billings, collections, cost reporting

3

and other financial matters related to the day-to-day operation of the hospital. In or about March 2000, Bainbridge succeeded Braddock in connection with the Edgewater management contracts, and thereafter had the same rights and responsibilities under the management contracts as had Braddock.

Beginning prior to 1995 and continuing at least until the end of 2000, Roger Ehmen was a senior administrator at Edgewater Hospital. He held various titles. At the end of his tenure, Ehmen was the Senior Vice President for Edgewater Hospital. He was one of the key administrators at the hospital. Ehmen had significant responsibilities, which included recruiting doctors for Edgewater's medical staff, signing physicians' contracts and other documents on behalf of the hospital, and handling certain complaints from doctors and staff. Ehmen also was responsible for maintaining and increasing the number of patients admitted to the hospital. Physicians and others reported directly to Ehmen concerning certain matters. During the time period that Braddock had the Edgewater management contract, Ehmen was employed by Braddock and was an agent of Braddock in connection with his activities at Edgewater. During the time period that Bainbridge had the Edgewater management contract, Ehmen was employed by

4

Bainbridge and was an agent of Bainbridge in connection with his activities at Edgewater.

Medicare was a health care benefit program as defined in 18 U.S.C. § 24. Medicare ordinarily authorized payment for physician and hospital services only if those services were "medically necessary," that is, services required because of disease, disability, infirmity or impairment. Medicare would not pay for services and treatment if the patient did not meet criteria which indicated that the patient needed the relevant services and treatment. In addition, Medicare would not pay for services provided as a result of referrals that violated 42 U.S.C. § 1320a-7b. That statute prohibited anyone from paying or receiving monies or otherwise providing or accepting a thing of value, directly or indirectly, in exchange for patient referrals where such payments were made knowingly and willfully. Medicare was administered by The Centers for Medicare and Medicaid Services or its predecessor ("CMS").

### The Scheme

Beginning no later than in or about 1995 and continuing until approximately December 2000, Ehmen, as a Senior Vice President of Edgewater and as an agent of Braddock and Bainbridge, together with others, devised and intended to devise,

5

and participated in a scheme to defraud and to obtain money and property from Medicare by means of materially false and fraudulent pretenses, representations and promises, which scheme is further described below.

The scheme to defraud Medicare included the following. Braddock and Bainbridge, through Ehmen, who was acting as the agent of Braddock and Bainbridge,[1] caused Edgewater to make payments to certain doctors and other individuals in exchange for patient referrals to Edgewater. These kickbacks were concealed by creating contracts and other mechanisms that created the false impression that the payments were for legitimate services. The individuals to whom Braddock and Bainbridge, through Ehmen, caused Edgewater to pay kickbacks included Dr. Sheshquiri Rao Vavilikolanu ("Rao"), Dr. Kumar M. Kaliana ("Kumar"), Dr. Andrew Cubria, Dr. Ravi Barnabas and others.

Ehmen knew, among other things: (1) that these doctors and their associates were recruiting patients by giving patients cash

---

[1]     The government contends that others besides Ehmen acted as agents of Braddock and Bainbridge in connection with the misconduct described herein. Defendant disagrees with the government's view of the evidence. The parties agree, however, that Ehmen acted as an agent of Braddock and Bainbridge, and that, based on Ehmen's conduct, those entities are guilty as charged in the second superseding information.

or other benefits and promising that hospital services would cost the patients nothing (i.e., that Medicare deductibles and co-payments would be waived); (2) that these doctors and their associates were coaching some patients to lie about their physical condition and were lying to other patients about their need for hospitalization; (3) that these doctors were admitting patients to Edgewater who did not need to be admitted to the hospital; (4) that these doctors were performing medically unnecessary procedures and testing on certain patients; (5) that these doctors were creating false records to justify and support claims submitted to insurers, including false medical and business records; (6) that these doctors and Edgewater were submitting false and fraudulent claims to Medicare, in that the claims fraudulently sought compensation for medically unnecessary admissions, services, procedures and testing, and for services rendered to patients who were referred to the hospital in exchange for kickbacks. Ehmen, as an agent of Braddock and Bainbridge, encouraged and assisted in these acts, and caused them to happen.

Ehmen also caused Edgewater Hospital to submit Cost Reports to Medicare, including for the year 1999, that falsely represented that services provided by Edgewater were provided in

7

compliance with the laws and regulations regarding the provision of health care services. This was false because, among other things, Edgewater was providing services to patients that were medically unnecessary and whose presence in the hospital was the result of the payment of kickbacks.

The kickbacks that Ehmen caused Edgewater to pay in return for admissions to Edgewater included the following.

### Payments To Rao And Kumar

In or about October 1996, Ehmen caused Edgewater to agree to pay monies to Rao, and to give Rao a contract to provide anesthesia services to Edgewater's patients, if Rao referred a substantial number of patients to the hospital for admission. In return, Rao agreed that he would try to admit to the hospital each month: (a) patients for medical treatment; and (b) patients for detoxification treatment.

In order to carry out the agreements made during the October 1996 meeting:

a. In or about April 1997, Ehmen caused Edgewater to give Rao's company, Rao, M.D., S.C., a contract, that enabled Rao to bill for all anesthesia services provided at the hospital, which contract was awarded to Rao in return for patient admissions.

8

b.   Between May 1997 and May 1998, Ehmen caused Edgewater to pay Rao's company, Rao, M.D., S.C., approximately $15,000 a month, totaling more than $200,000, in exchange for patient admissions.   Rao, with Ehmen's knowledge and consent, used a portion of those monies - in excess of $150,000 - to pay Kumar for the admission of patients for medical treatment, for which Rao received credit.

c.   On or about November 14, 1997, Ehmen caused Edgewater to give a contract to Rao's company, Florascribe in order to conceal the fact that Edgewater was paying defendant Rao for patient referrals and admissions.

d.   Between August 1997 and April 1998, Ehmen caused Edgewater to make approximately seven payments of $20,000 each to Rao's company, Florascribe, totaling approximately $140,000, in exchange for patient admissions.   Rao used a portion of those monies to pay patient recruiters for the admission of patients for detoxification ("detox") treatments.

### Payments to Cubria

For a period of years through at least December 2000, Ehmen caused Edgewater to pay monies exceeding $1,000,000 for television advertising that generated patients for Cubria's medical practice.   Ehmen caused these amounts to be paid so that

9

Cubria would maintain and/or increase the number of patients he admitted to Edgewater Hospital and to encourage Cubria to help Edgewater increase its revenues.

From approximately 1998 and through at least December 2000, Ehmen caused Edgewater to give a contract to Cubria to act as a medical director for the Cardiac Rehabilitation Program, with payments to Cubria of approximately $48,000 per year. Cubria performed little or no work under the contract. Ehmen caused Cubria to be paid these amounts so that he would maintain and/or increase the number of patients he admitted to Edgewater Hospital and to encourage Cubria to help Edgewater increase its revenues.

On or about September 11, 2000, at Chicago, defendant Braddock Management L.P. did knowingly and willfully execute and attempt to execute the scheme in connection with the delivery of and payment for health care benefits, items and services, in that on or about that date, defendant caused Medicare to pay Edgewater approximately $1,171 for services rendered at Edgewater by Dr. Cubria to patient R. Cru. as part of the scheme.

As a result of this scheme, Medicare and CMS were fraudulently billed and lost approximately $13,644,598.

10

6.      For purposes of applying the Guidelines promulgated by the United States Sentencing Commission pursuant to Title 28, United States Code, Section 994, the parties stipulate and agree on the following points:

a.   The November 1, 1998 Sentencing Guidelines Manual governs.   The applicable guideline is § 8A1.2.

b.   Restitution is authorized under 18 U.S.C. § 3663 and is mandatory under 18 U.S.C. § 3663A.   Therefore, pursuant to § 8B1.2(a)(1), the Court shall enter a restitution order for the full amount of the victim's loss, which in this case is $13,644,598.   This restitution obligation shall be joint and several with Braddock Management L.P.

c.   A remedial order pursuant to § 8B1.2 is not appropriate.

d.   Community service pursuant to § 8B1.3 is not appropriate.

e.   An order of notice to victims, pursuant to § 8B1.4 is not appropriate.

f.   A determination of the fine guideline is unnecessary and no fine is appropriate, pursuant to §§ 8C2.2(a) and 8C3.3(a), because it is readily ascertainable that the defendant cannot and is not likely to become able (even on an

11

installment schedule) to pay the restitution required under §
8B1.1.

g.   Because no fine is appropriate, a sentence of
probation is required, pursuant to § 8D1.1(a)(7).   Because the
offense of conviction is a felony, the term of probation shall be
at least one year but not more than five years, pursuant to §
8D1.2(a)(1).

h.   Based on the facts known to the government, the
defendant has no criminal history.

i.   The defendant and its attorney and the government
acknowledge that the above calculations are preliminary in nature
and based on facts known to the government as of the time of this
Agreement.   The defendant understands that the Probation
Department will conduct its own investigation and that the Court
ultimately determines the facts and law relevant to sentencing,
and that the Court's determinations govern the final Sentencing
Guidelines calculation.   Accordingly, the validity of this
Agreement is not contingent upon the probation officer's or the
Court's concurrence with the above calculations.

7.   Errors in calculations or interpretation of any of the
guidelines may be corrected by either party prior to sentencing.
The parties may correct these errors or misinterpretations either

12

by stipulation or by a statement to the probation office and/or court setting forth the disagreement as to the correct guidelines and their application. The validity of this Agreement will not be affected by such corrections, and the defendant shall not have a right to withdraw its plea on the basis of such corrections.

8. Defendant understands the count to which it will plead guilty carries the following maximum penalties: a term of probation of five years; a maximum fine of $500,000 or twice the gross gain or loss, whichever is greater; and any restitution ordered by the Court.

9. The defendant understands that in accordance with federal law, Title 18, United States Code, Section 3013, upon entry of judgment of conviction, the defendant will be assessed $400 on the count to which it has pled guilty, in addition to any other penalty imposed. The defendant agrees to pay the special assessment of $400 at the time of sentencing with a certified check or money order made payable to the Clerk of the U. S. District Court.

10. Defendant understands that by pleading guilty it surrenders certain rights, including the following:

(a) If defendant persisted in a plea of not guilty to the charges against it, it would have the right to a public and

13

speedy trial. The trial could be either a jury trial or a trial by the judge sitting without a jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

(b) If the trial is a jury trial, the jury would be composed of twelve layperson selected at random. Defendant and its attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising so-called peremptory challenges. The jury would have to agree unanimously before it could return a verdict of either guilty or not guilty. The jury would be instructed that defendant is presumed innocent, and that it could not convict unless, after hearing all the evidence, and considering each count separately, it was persuaded of defendant's guilt beyond a reasonable doubt.

(c) If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded of defendant's guilt beyond a reasonable doubt.

14

(d)   At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant.   Defendant would be able to confront those government witnesses and its attorney would be able to cross-examine them.   In turn, defendant could present witnesses and other evidence in its own behalf.   If the witnesses for defendant would not appear voluntarily, it could require their attendance through the subpoena power of the court.

(e)   Defendant understands that it has a right to have the charges prosecuted by an indictment returned by a concurrence of twelve or more members of a legally constituted grand jury consisting of not less than sixteen and not more than twenty-three members.   By signing this Agreement, defendant knowingly waives its right to be prosecuted by indictment and to assert at trial or on appeal any defects or errors arising from the second superseding information, the information process, or the fact that it has been prosecuted by means of information.

11.   Defendant understands that 18 U.S.C. § 3742 provides for appeal by a defendant of a sentence under certain circumstances, and that it may give up or waive said right to appeal.   Defendant also understands that under certain circumstances it has the right to attack its sentence in other

15

post-conviction proceedings. Defendant's attorneys have explained to the defendant its appellate rights, and its right to attack its guilty plea, conviction, and sentence in post-conviction proceedings, and the consequences of the waiver set forth in this paragraph. The defendant hereby expressly and knowingly waives and gives up any and all appellate rights conferred by § 3742 or by any other source whatsoever, in exchange for the concessions made by the United States in this Plea Agreement. The defendant also hereby expressly and knowingly waives and gives up any and all rights to attack its guilty plea, conviction, and sentence in any post-conviction proceeding, including the filing of a petition under 28 U.S.C. §§ 2255, 2241 or other post-conviction motion or petition. The waiver in this paragraph does not apply to a claim of involuntariness, or ineffective assistance of counsel, which relates directly to this waiver or to its negotiation. The defendant knowingly and voluntarily agrees to the terms of this paragraph.

12. Defendant understands that the second superseding information and this Plea Agreement shall be filed in the Clerk's Office, are matters of public record and may be disclosed to anyone.

13. Nothing in this Agreement shall limit the Internal Revenue Service in its collection of any taxes, interest or penalties from the defendant.

14. Defendant understands that the United States Attorney's Office will fully apprise the District Court and the United States Probation Office of the nature, scope and extent of defendant's conduct regarding the charges against it in this case, and related matters, including all matters in aggravation and mitigation relevant to the issue of sentencing.

15. The parties agree that Bainbridge Management L.P., a limited liability partnership, is entering into this plea agreement pursuant to the directive of its general partner, Bainbridge Management, Inc., which directive has been authorized in a resolution by the Sole Director of Bainbridge Management, Inc. The parties agree that this resolution is sufficient authorization for Bainbridge Management L.P. to enter into this plea agreement.

16. Regarding restitution, defendant acknowledges that, pursuant to Title 18, United States Code, Section 3663A, the Court must order defendant to make restitution in the full amount due and owing, minus any credit for funds repaid prior to sentencing. The parties agree that the Court, at sentencing,