shall order defendant to pay restitution to The Centers for Medicare and Medicaid Services ("CMS") in the amount of $13,644,598, and that such restitution shall be due immediately. This restitution obligation shall be joint and several with Braddock Management L.P.

17. Regarding a fine, the parties agree that no fine is appropriate. Nonetheless, defendant understands that Section 8C of the Sentencing Guidelines sets forth the factors to be weighed in setting a fine, if any, and in determining the schedule, if any, according to which a fine is to be paid in this case. The defendant agrees to provide full and truthful information to the Court, the United States Probation Office, and the United States Attorney's Office regarding all details of its economic circumstances in order to determine the proper fine and fine schedule, if any. Defendant understands that providing false or incomplete information may be prosecuted as a violation of Title 18, United States Code, Section 1001, or as a contempt of the court, and would constitute a breach of this Plea Agreement.

18. The parties agree that the economic circumstances of Braddock and Bainbridge are such that is extremely unlikely that the restitution ordered in this case will ever be paid by either defendant. Braddock and Bainbridge have negotiated a compromise

regarding restitution with the victim, CMS, and the United States Attorney's Office. Braddock and Bainbridge have agreed with the United States Attorney's Office and CMS that any and all restitution judgments entered by the Court will be fully satisfied and compromised to $2.9 million. The parties agree that, prior to the entry of a guilty plea by Braddock or Bainbridge, funds in the amount of $2,900,000 will be deposited into an attorney trust account with instructions that, upon the District Court's entry of an order implementing the restitution compromise as described herein, the custodian of the attorney trust account shall immediately deliver to the Clerk of the United States District Court a certified check in the amount of $2.9 million, which funds shall be applied toward the satisfaction of any judgments entered in this case. Proof that funds in the amount of $2,900,000 have been deposited into an attorney trust account will be provided to the United States Attorney's Office prior to the entry of a guilty plea by the defendants.

19. At the time of sentencing, the parties agree to jointly recommend: (a) that the Court impose a sentence of probation; (b) that the Court impose no fine or penalty; (c) that the Court order defendant to pay restitution to CMS, due immediately, in

19

the amount of $13,644,598, which obligation shall be joint and
several with Braddock Management L.P.; (d) that the Court enter
an order approving the negotiated restitution compromise and full
satisfaction between Braddock, Bainbridge, CMS and the United
States Attorney's Office; and (e) that the Court enter an order
directing the custodian of the aforementioned attorney trust
account to deliver immediately to the Clerk of the Court a
certified check in the amount of $2.9 million which is to be
applied to the negotiated restitution compromise.  On other
aspects of the sentence, the parties shall be free to recommend
whatever each deems appropriate.

20.   It is agreed by the parties that if the sentencing
judge does not accept the recommendations of the parties set
forth in Paragraph 19(b), 19(d) and 19(e), then (a) this
Agreement shall become null and void and neither party will be
bound thereto, (b) defendants will be entitled to withdraw their
guilty pleas, and (c) the custodian of the attorney trust account
for the $2.9 million escrowed pursuant to paragraph 18 of the
Agreement will immediately return this $2.9 million to the
depositor.  It is further agreed by the parties that, if the
sentencing judge accepts the recommendations of the parties set
forth in Paragraph 19(b), 19(d) and 19(e) and the custodian of

20

the aforementioned attorney trust account fails to deliver $2.9 million to the Clerk of the Court as described above, then this Agreement shall become null and void and neither party will be bound thereto.

21. The United States agrees not to seek additional criminal charges in the Northern District of Illinois against the defendants or Bainbridge Management Inc. based on conduct now known by the United States for the period from 1995 through 2001 that occurred in the Northern District of Illinois. However, nothing in this Agreement limits the United States in prosecution of the defendants in other districts or for crimes not known to the government at the time of this plea, except as expressly set forth in this Agreement.

22. After sentence has been imposed on the count to which defendant pleads guilty as agreed herein, the government will move to dismiss with prejudice the remaining counts as to this defendant, as well as Bainbridge Management, Inc., in all charging documents then on file with the Clerk in this criminal case. In addition, the government will move to dismiss defendant and Bainbridge Management, Inc. from the civil case in this court captioned United States of America v. Peter Rogan, Braddock

21

Management L.P, Bainbridge Management L.P. and Bainbridge
Management, Inc., Case No. 02 C 3310.

23. Defendant understands that its compliance with each
part of this Plea Agreement extends throughout and beyond the
period of its sentence, and failure to abide by any term of the
Plea Agreement is a violation of the Agreement. It further
understands that in the event it violates this Agreement, or if
the United States is unable to retain or obtain the financial
benefits of this Plea Agreement, the government, at its option,
may move to vacate the Plea Agreement, rendering it null and
void, and thereafter prosecute the defendant not subject to any
of the limits set forth in this Agreement, or to resentence the
defendant. The defendant understands and agrees that in the
event that the defendant's Plea is subsequently withdrawn,
vacated or breached by the defendant, and the Government elects
to void the Plea Agreement and prosecute the defendant, any
prosecutions that are not time-barred by the applicable statute
of limitations on the date of the signing of this Agreement may
be commenced against the defendant in accordance with this
paragraph, notwithstanding the expiration of the statute of
limitations between the signing of this Agreement and the
commencement of such prosecutions.

22

24. If the United States or its agencies are forced to give
up any of the financial benefits of this Plea Agreement, whether
as a result of a bankruptcy or otherwise, the parties agree: (a)
that the $2.9 million compromised restitution judgment shall be
reinstated and that the United States and its agencies shall be
free to pursue any and all remedies to collect on that judgment
from any party; and (b) that, in civil case 02 C 3310, the civil
settlement agreement shall govern, pursuant to which, among other
things, the government's civil claims in that case shall be
reinstated.

25. Defendant and its attorney acknowledge that no threats,
promises, or representations have been made, nor agreements
reached, other than those set forth in this Agreement, to cause
defendant to plead guilty.

23

26. Defendant acknowledges that it has read this Agreement and carefully reviewed each provision with its attorney. Defendant further acknowledges that it understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: *Jan. 15, 2003*

PATRICK J. FITZGERALD
UNITED STATES ATTORNEY

BAINBRIDGE MANAGEMENT L.P.
Defendant

By _____
For its general partner
Bainbridge Management, Inc.

JACQUELINE STERN
Assistant United States Attorney

VINCENT J. CONNELLY
Attorney for Defendant

KAARINA SALOVAARA
Assistant United States Attorney

BAINBRIDGE MANAGEMENT, INC.

By _____

Its _____

24

# **EXHIBIT C**

1            IN THE UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF ILLINOIS

2                  EASTERN DIVISION

3

    UNITED STATES OF AMERICA,      )

4                       )
          GOVERNMENT,        )

5                       )
    vs.                  ) No. 01 CR 469

6                       )
    ROGER EHMEN, et al.       ) Chicago, Illinois

7                       ) November 28, 2001
        Defendants.       ) 9:00 o'clock a.m.

8

9               TRANSCRIPT OF PROCEEDINGS
       BEFORE THE HONORABLE SUZANNE B. CONLON

10                 SENTENCING

11

APPEARANCES:

12

For the Government    THE HONORABLE SCOTT LASSAR

13                   UNITED STATES ATTORNEY, by
                   Ms. Jacqueline O. Stern

14                   Ms. Kaarina Salovaara
                   Mr. Daniel E. May

15                   Assistant United States Attorneys
                   219 South Dearborn Street,

16                      Suite 500
                   Chicago, Illinois   60604

17

    For Defendant        JONES, DAY, REAVIS & POGUE, by

18    Ehmen             Mr. Daniel E. Reidy
                   Mr. Christopher Cook

19                   77 West Wacker Drive
                   Chicago, Illinois   60601-1692

20

21   Court Reporter:

22                BLANCA I. LARA
             Official Court Reporter

23          United States District Court
      219 South Dearborn Street, Suite 2328A

24          Chicago, Illinois   60604
          Telephone (312) 435-5895

25

63

1  second point at which the government's recommendation on

2  October 15th takes a definite position, comes to a

3  total, and then has hedge language in other places of

4  the agreement.  I am referring to what position the

5  government took with respect to the Probation Office in

6  its calculations on page seventeen.

7          MS. STERN:  Judge, I was -- I was honestly

8  trying to do as thorough a job in a very complicated

9  case, where there are many witnesses, as I possibly

10  could.  And I've tried to give the Court as much

11  information as I possibly could.  And, obviously, I did

12  not intend to create confusion, but I have tried to

13  clarify.

14          THE COURT:  Minimally, did you do that.

15  Minimally, you have done that.

16          MS. STERN:  Judge, do you want me to address

17  the factual issue?

18          THE COURT:  Well, yes, if you would like to

19  expand your reasoning as to how Mr. Ehmen was in control

20  of the doctors who actually perpetrated the fraud.

21          MS. STERN:  Judge, I think that his role was

22  two-fold.  One is, he recruited people to participate in

23  the scheme.  And I think that there's abundant evidence

24  of that.

25          There was a doctor in early 1991.  And he

Blanca I. Lara - Official Court Reporter - (312) 435-5895

64

1    recruited that doctor and ended up paying a substantial

2    amount of money.  The hospital paid for patients from

3    that doctor, according to Dr. Barnabas who was present

4    during the conversations when Mr. Ehmen recruited that

5    doctor.

6         He recruited Barnabas to bring his patients

7    from Methodist saying, "What can we do to get you to

8    bring your patients?"

9         He recruited other individuals in order to get

10   them to bring patients.

11        On tape, when Rao and Barnabas came in with

12   the name of another doctor, it was Ehmen who planned to

13   go out and meet the doctor in order to recruit that

14   particular doctor.

15        In addition to that, he directed people in the

16   scheme.  For example, he told Dr. Rao and Barnabas that

17   Kumar had to educate the patients on what to say.  He

18   directed Rao and Barnabas to have Kumar coach the

19   patients.  On 4-10-98, which is identified in the

20   Santiago proffer on page twenty-nine, that is what Ehmen

21   told Rao and Barnabas, that Kumar had to educate the

22   patients on what to say.  And there are other tapes,

23   which are also summarized, in which he is telling -- he

24   is directing that Kumar must coach the patients.

25        In addition, he directed Barnabas to use

65

1  Cubria on all cardiac consults.  So Barnabas could have

2  used anybody who was at the hospital or used nobody, but

3  Ehmen directed Barnabas to take a certain action in

4  order to further the scheme, and that action was to use

5  Cubria on all cardiac consults.  And that's in

6  Dr. Barnabas' statements on page eight.

7         And when he was recruiting Monty McClellan to

8  work at the hospital, he told McClellan that Cubria

9  would be the cardiologist that McClellan would work

10  with.  And that's in transcript 169, May 2, 1997.

11         In addition, Judge, he was responsible for

12  hiring and firing.  And he directed patients -- I'm

13  sorry, he directed doctors to increase their admissions,

14  which was the point of the scheme.  Dr. Gee stated that

15  in November of '95 his Edgewater admissions dropped to

16  six or eight patients and Ehmen told him he needed to

17  admit more patients.  In October or November of '95 --

18  sorry, in December of '95, Dr. Gee only admitted two

19  patients to Edgewater and Ehmen told him that his

20  admissions were low and that he needed to pick them up.

21  in January of '96 Ehmen met with him and fired him.

22         There was a woman named Marilyn Tolliver, and

23  she was hired by Ehmen in order to obtain patients as

24  part of a home visit process.  And she submitted a

25  resignation letter stating she was resigning because the

66

1  program was admitting patients who didn't need

2  hospitalization.  And when Ehmen got the letter, he told

3  her to change it because he didn't like what was in it.

4  Ehmen told her that he expected her to admit twenty

5  patients to the hospital each month, and he told her to

6  see more patients in order to get more admissions.

7       There was a woman named Sherry Bottbaum who

8  worked at the hospital as an administrative assistant to

9  Roger Ehmen.  And he directed her to falsify time sheets

10  and back-date them, and that was because, again, these

11  are patients specifically for Barnabas, Cubria and

12  another doctor and Sriram who were not providing the

13  services that the contract was paying for.

14       And other people have provided information

15  saying that Ehmen called and directed them to admit

16  additional patients.

17       So, Judge, he was recruiting doctors and he

18  was directing doctors, which, I believe, makes him a

19  leader or organizer.

20       THE COURT:  Mr. Cook?

21       MR. COOK:  Your Honor, everything that

22  Ms. Stern has alleged is consistent with Mr. Ehmen being

23  a manager or supervisor.  And, in fact, everything that

24  she has alleged was known to the government on October

25  15th when they came to the conclusion that Roger Ehmen

67

1   was a manager or a supervisor.

2           But more importantly, your Honor, Roger Ehmen

3   was not at the top of the pyramid.  The purpose of this

4   enhancement is to have variable culpability for people

5   at varying levels of responsibility.  The submission

6   made by the government this morning to your Honor and

7   yesterday to the defense through Dr. Garofsky, I think,

8   is particularly telling in that respect.  On that

9   interview on November 7th, Dr. Garofsky says, on page

10  three:

11          "...Ehmen always answered to Rogan.  He

12          could never do anything on his own...,"

13          According to the Government's evidence --

14          THE COURT:  Mr. Rogan was the owner?

15          MR. COOK:  Rogan was the owner and the CEO,

16  your Honor.

17          According to the government's contentions and

18  the Government's evidence, everything that the

19  Government just described that Roger Ehmen did is, under

20  the government's view of the evidence, something that

21  Peter Rogan told him to do.

22          The way the government has set up this scheme,

23  your Honor, and the way it operated, was the doctors

24  operated it, with Dr. Rao running the show.  I believe

25  the tapes amply support the fact that Dr. Rao, on that

68

1  side of the scheme, was running the show.

2          On the hospital side, similarly, Roger Ehmen

3  worked for Peter Rogan.  The contract negotiations, when

4  Barnabas and Rao approached Mr. Ehmen -- not the other

5  way around, at least according to Dr. Barnabas'

6  statement on page five attached to their November 7th

7  version of the offense -- when Barnabas and Rao

8  approached Roger Ehmen, it was Peter Rogan that closed

9  the deal.

10         Your Honor, moreover, it's important to note

11 that Roger Ehmen did not have a claimed right to a

12 larger share of the fruits of the crime as an organizer

13 or leader.  Of all of the people in this case, your

14 Honor, Roger Ehmen is the only one who took home only

15 his salaries.  The doctors received billings directly as

16 a result of the improper conduct.  They received bribes,

17 the hospital made profits.  Roger Ehmen earned a salary.

18 Earning a salary is not consistent with being the

19 organizer or the leader of the scheme.  It is absolutely

20 consistent with being a manager or a supervisor.

21         So, your Honor, a manager or a supervisor, by

22 definition, is going to have some degree of control over

23 others in the scheme.  He is going to manage them, to

24 direct what they do, but simply not be the moving force

25 in organizing the scheme.  And I think the government's

Blanca I. Lara - Official Court Reporter - (312) 435-5895

69

1  evidence, as they concluded originally on October 15th,

2  overwhelmingly shows that Dr. Rao, and as they allege,

3  Peter Rogan, organized the scheme, but that Dr. Barnabas

4  and Roger Ehmen held similar positions as managers and

5  supervisors in the scheme.  And we would ask that

6  Mr. Ehmen be sentenced with an enhancement similar to

7  Dr. Barnabas' as a manager or supervisor.

8            THE COURT:  Was Mr. Rogan indicted

9  separately?

10           MS. STERN:  Judge, he has not been charged.

11 And may I address some of the points?

12           THE COURT:  I'm curious as to why.  He was the

13 owner of the operation and he had the power to hire or

14 fire Mr. Ehmen.  Is the government's view that he wasn't

15 a part of this?  I thought he was named as a

16 coconspirator.

17           MS. STERN:  Judge, people have told us -- for

18 example, Cubria said that when the investigation came

19 up, he came to Cubria and said destroy your notes,

20 destroy your computer.  We have had testimony or

21 information from various people, but the fact of the

22 matter is, the person that everyone dealt with was Roger

23 Ehmen.  He was the front man.  He made the statements,

24 he dealt with the doctors, he signed the contracts, he

25 negotiated the contracts.  Now, he often said, and he

Blanca I. Lara - Official Court Reporter - (312) 435-5895

70

1    says on tape, "I have to check with Rogan.  I'll get

2    back to you," but the fact of the matter is, the direct

3    contact was Rogan.

4        Now, he told Garofsky -- Garofsky said he

5    talked with him, for example, about Cubria many times.

6    And Ehmen said, "I talked to Rogan and he's not going to

7    do anything about it."  And Garofsky says, basically,

8    that the doctors in the hospital who run quality

9    assurance had no power, they couldn't enforce the

10   quality assurance in any way.  And that is what

11   Dr. Zanetti says as well.

12       The hospital, Judge, was set up in a way that

13   allowed this fraud to proceed.  They had one woman who

14   was the quality assurance person for the entire

15   hospital.  And she was the one who gave the files to the

16   doctors for the doctors to review.  So there really was

17   no quality assurance.  And it was Ehmen and Rogan who

18   set the hospital up in that way.

19       Rogan and Ehmen, it appears from the evidence,

20   worked hand in hand.  And I think that it is fair to say

21   that more than one person would deserve a leader or

22   organizer enhancement, but the fact that Rogan is

23   working closely with Ehmen and that they conspired

24   together and made decisions together and that Ehmen is

25   the one who is doing the recruiting and is out talking

72

1    to the doctors and telling the doctors there is no hope

2    to getting any change in this hospital, still leaves him

3    at the top of the pyramid, side by side with the owner

4    of the hospital.

5         And in terms of the amount of money that he

6    makes, Judge.  He made 1 million dollars over the period

7    half of the 1990's, and he got bonuses as part of that

8    1 million dollars.  The fact is, he was very well

9    rewarded in his position.  He made more than $100,000 a

10   year, more than $150,000 a year.

11        THE COURT:  All right.  Well, again, the role

12   in the offense, there is no dispute.  The defendant

13   doesn't dispute that he was a manager or supervisor.

14   And, indeed, that was the position the government took

15   in its proposed guideline calculations in its October

16   15th submission.

17        There are a number of factors one needs to

18   consider in determining role.  The supreme or top

19   penalty, of course, goes to the person who is clearly

20   the organizer or leader, and that must be established by

21   a preponderance of the evidence.  It must be shown that

22   that person was the ultimate decisionmaker, that he had

23   the control.  And another indicator is whether or not

24   the leader or organizer has a larger share of the fruits

25   of the crime.  Here we have a salaried employee.

# EXHIBIT D

1

1          IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3

UNITED STATES OF AMERICA,        )
4                                )
          GOVERNMENT,            )
5                                )
vs.                              ) No. 01 CR 469 - 2 & 3
6                                )
RAVI T. BARNABAS & ROGER EHMEN,) Chicago, Illinois
7                                ) October 1, 2001
          Defendants.           ) 4:00 o'clock p.m.
8

9              TRANSCRIPT OF PROCEEDINGS
      BEFORE THE HONORABLE SUZANNE B. CONLON
10                  GUILTY PLEAS

11

APPEARANCES:
12

For the Government    THE HONORABLE SCOTT LASSAR
13                    UNITED STATES ATTORNEY, by
                      Ms. Jacqueline O. Stern
14                    Ms. Kaarina Salovaara
                      Assistant United States Attorneys
15                    219 South Dearborn Street
                           Suite 500
16                    Chicago, Illinois     60604

17

Court Reporter:
18

19                  BLANCA I. LARA
               Official Court Reporter
20           United States District Court
          219 South Dearborn Street, Suite 2328A
                 Chicago, Illinois   60604
21             Telephone (312) 435-5895

22

23

24

25

2

1    Appearances (Continued)

2
     For Defendant        JONES, DAY, REAVIS & POGUE, by
3    Ehmen                Mr. Christopher Cook
                          Mr. Joseph Shereda
4                         77 West Wacker Drive
                          Chicago, Illinois   60601-1692
5

6    For Defendant        MONICO, PAVICH & SPEVACK, by
     Barnabas             Mr. Michael D. Monico
7                         Mr. Barry A. Spevack
                          29 South LaSalle Street
8                             Suite 720
                          Chicago, Illinois   60603
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

12

```
1              DEFENDANT EHMEN:  It's Ehmen.

2              THE COURT:  Ehmen.  Yes.

3              Would you state your full name and spell your

4    last name.

5              DEFENDANT EHMEN:  First name is Roger,

6    R-o-g-e-r, middle name is Henry, last name is Ehmen,

7    E-h-m-e-n.

8              THE COURT:  How old are you, Mr. Ehmen?

9              DEFENDANT EHMEN:  55 years old.

10             THE COURT:  And where do you live?

11             DEFENDANT EHMEN:  Arlington Heights,

12   Illinois.

13             THE COURT:  And, Dr. Barnabas, did I ask you

14   where you lived?  I don't know if I did.

15             DEFENDANT BARNABAS:  No, you didn't, but I

16   live in Lincolnwood, Illinois.

17             THE COURT:  I see.

18             And how far did you go in school, Mr. Ehmen?

19             DEFENDANT EHMEN:  I have a masters in business

20   administration.

21             THE COURT:  From where?

22             DEFENDANT EHMEN:  From Northern Illinois

23   University.

24             THE COURT:  And what kind of work have you

25   done in the last 3 years?
```

13

1    DEFENDANT EHMEN:  I have worked in

2  administrative capacity at Edgewater Medical Center.

3    THE COURT:  And when did that terminate?

4    DEFENDANT EHMEN:  That terminated in February

5  of 2001, your Honor.

6    THE COURT:  Are you in good physical health?

7    DEFENDANT EHMEN:  Yes, I am, your Honor.

8    THE COURT:  Have you taken any drugs,

9  medication or alcohol in the last 24 hours?

10    DEFENDANT EHMEN:  No, your Honor.

11    THE COURT:  Not of any kind?

12    DEFENDANT EHMEN:  No.

13    THE COURT:  Have you ever been under the care

14  of a doctor or in a hospital for any kind of a mental

15  problem?

16    DEFENDANT EHMEN:  No, your Honor.

17    THE COURT:  And, counsel, do you have any

18  information that might suggest to you that Mr. Ehmen has

19  ever had any kind of mental problem or disturbance?

20    MR. COOK:  No, your Honor.

21    MS. STERN:  No, your Honor.   Again, with

22  Mr. Ehmen, I have spent a number of hours talking with

23  him and with federal agents, and, again, he was very

24  clear in his answers and understood the questions and

25  acted appropriately.

14

1      THE COURT:  And, Mr. Cook, let me ask you,

2  without disclosing the contents or substance of your

3  conversations with your client, in your professional

4  judgment does Mr. Ehmen understand the nature of these

5  proceedings?

6      MR. COOK:  Yes, your Honor, he does.

7      THE COURT:  In a rather complex charge made

8  against him in Count 57 of the indictment?

9      MR. COOK:  Yes, your Honor, he does.

10     THE COURT:  In your professional judgment, is

11  Mr. Ehmen capable of cooperating with you in the defense

12  of this case?

13     MR. COOK:  Yes, your Honor, he is.

14     THE COURT:  And does he appear lucid and

15  rational in your dealings with him?

16     MR. COOK:  Yes, he does, your Honor.

17     THE COURT:  All right, Mr. Ehmen, I do find

18  that you are mentally competent today to offer a plea of

19  guilty.

20     Have you had enough time to discuss this

21  matter with your attorneys?

22     DEFENDANT EHMEN:  Yes, your Honor.

23     THE COURT:  And have you told them basically

24  everything you are aware of in connection with this

25  case?

Blanca I. Lara - Official Court Reporter - (312) 435-5895

15

1    DEFENDANT EHMEN:  Yes, your Honor.

2    THE COURT:  Are you satisfied with the advice

3 they've given you and the efforts your attorneys have

4 made on your behalf?

5    DEFENDANT EHMEN:  Yes, your Honor.

6    THE COURT:  All right.  Now, Count 57 of the

7 indictment charges racketeering.  And I am going to,

8 again, ask each of you whether you have personally read

9 the allegations about you and others concerning Count

10 57.

11    Dr. Barnabas, have you read this charge?

12    DEFENDANT BARNABAS:  Yes, your Honor.

13    THE COURT:  And, Mr. Monico, without

14 disclosing the substance of your conversations, have you

15 gone through all the allegations the government has made

16 against your client in Count 57?

17    MR. MONICO:  Yes, your Honor.

18    THE COURT:  And, in a general sense, again

19 without disclosing the content of your conversations,

20 have you explained to your client the legal implications

21 of a complex racketeering charge such as this?

22    MR. MONICO:  I have, your Honor, yes.

23    THE COURT:  And, in your professional

24 judgment, does Dr. Barnabas understand the nature of the

25 charge, the complex charge made in Count 57?

16

1          MR. MONICO:  Yes, your Honor.

2          THE COURT:  And the consequences to himself?

3          MR. MONICO:  Yes, your Honor.

4          THE COURT:  Mr. Ehmen, have you personally

5   read Count 57 of the indictment?

6          DEFENDANT EHMEN:  Yes, your Honor.

7          THE COURT:  And, Mr. Cook, have you and your

8   co-counsel, again without disclosing the substance of

9   your conversations, have you explained to Mr. Ehmen the

10  complex nature of the racketeering charge made in Count

11  57 --

12         MR. COOK:  Yes, I have, your Honor.

13         THE COURT:  -- and the implications to your

14  client?

15         MR. COOK:  Yes, your Honor, counsel and I

16  have.

17         THE COURT:  Now, I have several questions that

18  I am going to direct to both you, Dr. Barnabas, and

19  Mr. Ehmen, but I need to hear from you individually.

20         Do you each understand that under the

21  constitution and laws of the United States you are

22  entitled to a jury trial on all the charges against you?

23         DEFENDANT BARNABAS:  Yes your Honor.

24         DEFENDANT EHMEN:  Yes, your Honor.

25         THE COURT:  And at the jury trial, you would

17

1   have the right to see and hear the testimony of the

2   prosecution witnesses, your attorneys would have the

3   right to cross-examine the prosecution witnesses, and

4   you would have the benefit of the Court's subpoena power

5   to bring your own witnesses to testify on your behalf.

6   Do you understand?

7            DEFENDANT BARNABAS:  Yes, your Honor.

8            DEFENDANT EHMEN:   Yes, your Honor.

9            THE COURT:  Do you understand that you each

10  have the right to continue in your plea of not guilty?

11           DEFENDANT BARNABAS:  Yes, your Honor.

12           DEFENDANT EHMEN:   Yes, your Honor.

13           THE COURT:  And if you continue in your plea

14  of not guilty, you would have the right to a speedy

15  trial, which I think has been set in early November.

16           MR. SPEVACK:  November 2nd, your Honor.

17           THE COURT:  And do you understand that you

18  would have that right?

19           DEFENDANT BARNABAS:  Yes, your Honor.

20           DEFENDANT EHMEN:   Yes, your Honor.

21           THE COURT:  Do you understand at the trial you

22  would each be presumed to be innocent, and the

23  government would be obligated to prove your guilt,

24  individually, beyond a reasonable doubt?

25           DEFENDANT BARNABAS:  Yes, your Honor.

1        DEFENDANT EHMEN:   Yes, your Honor.

2        THE COURT:  Do you understand that at trial

3  you would each have the right to testify on your own

4  behalf, if you wanted to?

5        DEFENDANT BARNABAS:  Yes, your Honor.

6        DEFENDANT EHMEN:   Yes, your Honor.

7        THE COURT:  And as I explained earlier, you

8  also have the right not to testify.  So if you wanted to

9  go to trial but you did not want to testify, you would

10  have that right, and the jury could not consider your

11  silence in any way as evidence against you.  Do you

12  understand, Dr. Barnabas?

13        DEFENDANT BARNABAS:  Yes, your Honor.

14        THE COURT:  Mr. Ehmen?

15        DEFENDANT EHMEN:   Yes, your Honor.

16        THE COURT:  Do you understand that you could

17  either have a trial by jury or a trial by me without a

18  jury if you wanted to go to trial but you didn't

19  particularly want a jury trial, do you understand you

20  have that option, a bench trial?

21        DEFENDANT BARNABAS:  Yes, your Honor.

22        DEFENDANT EHMEN:   Yes, your Honor.

23        THE COURT:  If we had a jury trial in the

24  case, we would select twelve persons at random from the

25  voter rolls for the Northern District of Illinois.  You

19

1   and your attorneys would have the right to challenge any

2   prospective juror for possible bias or prejudice, and,

3   collectively, you could excuse ten additional

4   prospective jurors without giving me any reason at all.

5   Do you understand?

6        DEFENDANT BARNABAS:  Yes, your Honor.

7        DEFENDANT EHMEN:   Yes, your Honor.

8        THE COURT:  This means that you and your

9   attorneys would play a significant role in deciding who

10  sat in judgment on you.  Do you understand?

11       DEFENDANT BARNABAS:  Yes, your Honor.

12       DEFENDANT EHMEN:   Yes, your Honor.

13       THE COURT:  Do you understand that the jury

14  would have to agree unanimously, and individually, on

15  each of your guilt?  In other words, the jury would have

16  to consider the evidence against you individually and

17  determine whether there was sufficient evidence to

18  prove your guilt as to each charge beyond a reasonable

19  doubt.

20       DEFENDANT BARNABAS:  Yes, your Honor.

21       DEFENDANT EHMEN:   Yes, your Honor.

22       THE COURT:  And they would have to consider

23  the evidence as to each count and each individual

24  defendant and co-defendant separately in terms of the

25  sufficiency of the evidence.

20

1        DEFENDANT BARNABAS:  Yes, your Honor.

2        DEFENDANT EHMEN:   Yes, your Honor.

3        THE COURT:  Do you understand that if at trial

4   you were found guilty, you would have the right to an

5   appeal of all issues you raised before trial, during

6   trial and after trial?

7        DEFENDANT BARNABAS:  Yes, your Honor.

8        DEFENDANT EHMEN:   Yes, your Honor.

9        THE COURT:  One of the important rights you

10  give up by pleading guilty is the right to an appeal of

11  most of the issues, legal and evidentiary issues that

12  you're entitled to raise if you go to trial.  Do you

13  understand you are giving up that right?

14        DEFENDANT BARNABAS:  Yes, your Honor.

15        DEFENDANT EHMEN:   Yes, your Honor.

16        THE COURT:  And in your case, Dr. Barnabas, I

17  understand from the plea agreement that you wish to give

18  up your right to an appeal also of sentencing issues

19  that you might raise, is that correct?

20        MR. MONICO:  Judge, I think that according to

21  the paragraph it says as long as the sentence is within

22  the guideline range or below we would waive that.  If

23  it's above the guideline range, we have not waived

24  that.

25        THE COURT:  He is waiving his right to an

21

1  appeal of any sentencing issues he raise as to

2  application of the guidelines?

3          MR. MONICO:  Yes, your Honor.

4          MS. STERN:  Yes.

5          THE COURT:  So you understand, ordinarily,

6  Dr. Barnabas, even pleading guilty, you would still have

7  the right to an appeal of any issues regarding

8  sentencing guidelines that would apply to your case?

9          DEFENDANT BARNABAS:  Yes, your Honor.

10          THE COURT:  And do you concur in your client

11  waiving any issues related to the application of the

12  sentencing?

13          MR. MONICO:  Under the circumstances here,

14  your Honor, this is the position we're in, is that we've

15  made this decision.

16          THE COURT:  All right.  And is it your

17  decision to waive your right to an appeal of any

18  sentencing guideline issues that you raise?

19          DEFENDANT BARNABAS:  Yes, your Honor.

20          THE COURT:  And, Mr. Ehmen, as I understand

21  it, you do not have a written plea agreement with the

22  United States, is that correct?

23          DEFENDANT EHMEN:  That's correct, your Honor.

24          THE COURT:  So even if you decide to enter a

25  plea of guilty, you understand you still have the right

22

1  to an appeal of any sentencing issues you raise?

2          DEFENDANT EHMEN:  Yes, your Honor.

3          THE COURT:  Now, Dr. Barnabas, Mr. Ehmen, do

4  you each understand that if you enter a plea of guilty

5  and if I accept your plea of guilty, we will not have a

6  trial as to you, and I would enter a judgment of guilt

7  based on your guilty plea, and sentence you after I have

8  had the benefit of an independent investigation that

9  would be conducted by the Probation Office, and after I

10 have heard from each of you, your attorneys and counsel

11 for the United States as to what the appropriate

12 sentencing is in the case?

13         DEFENDANT BARNABAS:  Yes, your Honor.

14         DEFENDANT EHMEN:   Yes, your Honor.

15         THE COURT:  Now, I cannot tell you today which

16 sentencing guidelines apply to your case because I,

17 frankly, do not know the details about the case or your

18 individual involvement, nor do I know anything about

19 each of your criminal histories.  What I can tell you

20 today is the maximum punishment provided by law for the

21 offense charged in Count 57, which is a very serious

22 offense.

23         Count 57 carries a maximum penalty of 20 years

24 imprisonment, a maximum fine of $250,000, or not more

25 than twice the gross gain to each of you or twice the

23

1  gross loss to the victims, which, from my reading at

2  least of the plea agreement, seems to be far in excess

3  of $250,000.

4        MS. SALOVAARA:  That will be the government's

5  understanding, your Honor.

6        THE COURT:  So it is very likely the fine

7  would be in excess of $250,000, do you understand?

8        DEFENDANT BARNABAS:  Yes.

9        DEFENDANT EHMEN:  Yes.

10       THE COURT:  I couldn't tell you today what it

11 would be, because, again, that information is not

12 available to me.

13       The charge in Count 57 also carries a term of

14 supervised release of at least two years and not more

15 than 3 years, plus any restitution that is ordered by

16 the Court.  In addition, by law, I would be required to

17 impose a special assessment of $100 that would be due at

18 the time of sentencing.

19       And the racketeering charge also carries the

20 possibility, in fact, in Dr. Barnabas' case, the

21 certainty of a forfeiture order.  Is there an agreement

22 for 1 million-dollar forfeiture order as to

23 Dr. Barnabas?

24       MS. STERN:  Yes, Judge.

25       DEFENDANT BARNABAS:  Yes.

Blanca I. Lara - Official Court Reporter - (312) 435-5895

24

1          THE COURT:  Do you understand that, by

2    agreement, there is going to be an agreed judgment of

3    1 million dollars forfeiture with respect to you?

4          DEFENDANT BARNABAS:  Yes, your Honor.

5          THE COURT:  And, Mr. Ehmen, do you understand

6    that the racketeering charge carries the possibility of

7    a forfeiture order against you, as well?  I understand

8    there is no agreement as to the order or as to the

9    amount of an order, but you understand that possibility

10   is there?

11         DEFENDANT EHMEN:   Yes, your Honor.

12         MR. MONICO:  May I have just one moment with

13   the AUSA?

14         THE COURT:  Yes.

15      (Brief pause.)

16         MR. MONICO:  Your Honor, in fact, my

17   understanding is that we will be admitting to a

18   forfeiture to the same extent as Dr. Barnabas is.  As

19   part of our guilty plea today, it does include

20   admissions to the allegations.

21         THE COURT:  I see.

22         THE COURT:  All right.  Is that your

23   understanding, Mr. Ehmen, that you're admitting the

24   forfeiture allegations in Count 57?

25         DEFENDANT EHMEN:   Yes, your Honor.

25

1          THE COURT:  And that subjects you to a strong

2    likelihood that a forfeiture order will be entered

3    against you?

4          DEFENDANT EHMEN:   Yes, your Honor.

5          THE COURT:  Now, with respect to Dr. Barnabas,

6    I've been given a draft plea agreement.

7          Do you have the final signed plea agreement?

8          MS. SALOVAARA:  We do, your Honor.  I'll

9    tender that to your minute clerk.

10          (Brief pause.)

11          THE COURT:  I have been handed a plea

12   agreement as to Dr. Barnabas, which is twenty-seven

13   pages long.  On page twenty-seven it bears the date of

14   October 1st, 2001, and there is a signature over the

15   name Ravi Barnabas.

16          Is this your signature, Mr. Barnabas?

17          DEFENDANT BARNABAS:  Yes, your Honor.

18          THE COURT:  Did you personally read this

19   twenty-seven page plea agreement before you signed

20   it?

21          DEFENDANT BARNABAS:  Yes, your Honor.

22          THE COURT:  And, Mr. Monico, did you review

23   all the terms and conditions of this agreement before

24   you signed it?

25          MR. MONICO:  Yes, your Honor.

26

1      THE COURT:  All right, what promises has the

2  government made in connection with Dr. Barnabas'

3  decision to plead guilty?

4      MS. STERN:  Judge, the government has, in

5  paragraph sixteen, on page twenty-two, agreed not to

6  seek additional criminal charges for events between

7  January 1, 1990, May 17, 2001, that occurred in the

8  Northern District of Illinois, which has been described

9  in the proffer or is described in the plea agreement.

10  It does not limit the United States in other districts

11  or for information of crimes that the defendant has not

12  disclosed.

13      THE COURT:  Is that your understanding also,

14  Dr. Barnabas, that in the plea agreement the United

15  States Attorneys Office for the Northern District of

16  Illinois won't seek any additional criminal charges

17  against you --

18      DEFENDANT BARNABAS:  Yes, your Honor.

19      THE COURT:  -- for the period of time that is

20  specified, between January 1st, 1990 and May 17th of

21  this year?

22      DEFENDANT BARNABAS:  Yes, your Honor.

23      THE COURT:  But that this agreement does not

24  bind any other U.S. Attorney's Office, do you

25  understand?

27

1          DEFENDANT BARNABAS:  Yes, your Honor.

2          THE COURT:  And it does not include any

3  criminal conduct that you have not told them about,

4  should there be any.

5          DEFENDANT BARNABAS:  Yes, your Honor.  Yes,

6  your Honor.

7          MS. STERN:  On that same page, Judge,

8  paragraph eighteen, the government has stated that it

9  will make known to this Court the extent of the

10 defendant's cooperation.  And assuming his full and

11 truthful cooperation, shall make a downward departure

12 motion.  And the government will make a recommendation

13 to the Court that the sentence be one-third lower than

14 the low end of the applicable guideline range.  And that

15 if there is no motion for a downward departure, then the

16 government shall recommend a sentence at the low end of

17 the applicable guideline range.

18         THE COURT:  Well, Dr. Barnabas, is it your

19 understanding that the United States Attorney's Office

20 has promised that if you continue to cooperate with

21 them, they will file a motion for the Court to reduce

22 your sentence to two-thirds of the low end of the

23 guideline range the Court applied?

24         DEFENDANT BARNABAS:  Yes, your Honor.

25         THE COURT:  Now, I see in the plea agreement

Blanca I. Lara - Official Court Reporter - (312) 435-5895

28

1  that your attorney and counsel for the United States

2  have agreed to many of the sentencing guidelines that

3  apply to the case.  I just want to make sure you

4  understand that the lawyers' agreement about the

5  sentencing guidelines is not binding on the Probation

6  Office.

7           DEFENDANT BARNABAS:  Yes, your Honor.

8           THE COURT:  And it is not binding on me.  Both

9  the probation and the Court have an independent

10 obligation to evaluate all the facts and circumstances

11 and the law in applying the guidelines.

12          DEFENDANT BARNABAS:  Yes, your Honor.

13          THE COURT:  Is it also your understanding that

14 if the government decides not to file a downward

15 departure motion for your cooperation, if that happens,

16 they also promise to recommend a sentence at the low end

17 of the guideline range, whatever that is?

18          DEFENDANT BARNABAS:  Yes, your Honor.

19          MS. STERN:  Judge, paragraph twenty-three, on

20 page twenty-six, provides that after sentence has been

21 imposed on the count to which the defendant pleads

22 guilty, the government will move to dismiss the

23 remaining counts of the indictment.

24          THE COURT:  Is that your understanding too,

25 Dr. Barnabas, that all the rest of the charges against

29

 1  you would be dropped?

 2          DEFENDANT BARNABAS:  Yes, your Honor.

 3          THE COURT:  Do you understand that the amount

 4  of restitution in the case could exceed 5 million

 5  dollars?

 6          DEFENDANT BARNABAS:  Yes, your Honor.

 7          THE COURT:  And as I mentioned earlier, you

 8  understand -- or, actually, you agree that at the time

 9  of sentencing a forfeiture judgment shall be entered

10  against you in the amount of 1 million dollars?

11          DEFENDANT BARNABAS:  Yes, your Honor.

12          THE COURT:  Any other promises between the

13  parties?

14          MS. STERN:  I don't believe so, Judge.

15          THE COURT:  Mr. Monico, is that correct, any

16  other promises?

17          MR. MONICO:  Yes, your Honor, that's

18  correct.

19          THE COURT:  And let me ask you, Dr. Barnabas,

20  other than those promises that we've just reviewed, has

21  any agent of the government, attorney for the

22  government, or anyone you thought was giving you a

23  message from the government made any other promises to

24  you that have affected your decision to plead guilty?

25          DEFENDANT BARNABAS:  No, your Honor.

Blanca I. Lara - Official Court Reporter - (312) 435-5895

30

1          THE COURT:  Has anyone forced you in any way

2     to plead guilty?

3          DEFENDANT BARNABAS:  No, your Honor.

4          THE COURT:  Has anyone threatened you in any

5     way to cause you to plead guilty?

6          DEFENDANT BARNABAS:  No, your Honor.

7          THE COURT:  And do you understand that the

8     final decision as to what your sentence will be rests

9     entirely with me?

10         DEFENDANT BARNABAS:  Yes, your Honor.

11         THE COURT:  And with respect to Mr. Ehmen, as

12    I understand it, there is no written plea agreement with

13    the United States?

14         DEFENDANT EHMEN:  Yes, your Honor.

15         THE COURT:  And is that also your

16    understanding, Mr. Cook?

17         MR. COOK:  That is correct, your Honor.

18         THE COURT:  Ms. Stern?

19         MS. STERN:  There is no plea agreement,

20    Judge.

21         THE COURT:  And that means that absolutely no

22    promises or representations have been made to you by any

23    agent, or attorney for the government, or anybody else

24    you thought was giving you a message from the

25    government?

Blanca I. Lara - Official Court Reporter - (312) 435-5895

31

1           DEFENDANT EHMEN:   That's correct, your

2    Honor.

3           MS. STERN:   Judge, if I may clarify.

4           THE COURT:   Yes.

5           MS. STERN:   There is an outstanding proffer

6    letter.  So there is an agreement pursuant to the terms

7    of the proffer letter but that only relates to

8    information that he has provided to us pursuant to the

9    proffer letter.  It does not have to do with sentencing

10   as a plea agreement.  But just because there is an

11   agreement outstanding, to that extent, I wanted to draw

12   it to the Court's attention.  And that letter says that

13   other than what is encapsulated in the letter, there are

14   no other promises or agreements.

15          THE COURT:   Mr. Cook, what is your

16   understanding of this proffer letter?

17          MR. COOK:   Your Honor, the proffer letter was

18   an agreement that we entered into with the United States

19   Attorneys Office in which they offered the type of

20   protection contemplated under the guidelines and under

21   the rules of criminal procedure under which Mr. Ehmen

22   could make statements to the U.S. Attorney's Office and

23   used in the event of trial.  That agreement has nothing

24   to do with our decision to plead guilty here.

25          THE COURT:   I see.  And no promises have been

32

1   made by the government as to its position at

2   sentencing?

3           MR. COOK:  No, your Honor, none whatsoever.

4           THE COURT:  It's truly a blind plea, as that

5   term is popularly used?

6           MR. COOK:  Yes, your Honor.

7           THE COURT:  Has anyone forced you in any way

8   to plead guilty, Mr. Ehmen?

9           DEFENDANT EHMEN:   No, your Honor.

10          THE COURT:  Have any threats of any nature

11  been made to you by anyone to cause you to plead

12  guilty?

13          DEFENDANT EHMEN:   No, your Honor.

14          THE COURT:  Is it your own personal decision

15  to plead guilty?

16          DEFENDANT EHMEN:   Yes, your Honor.

17          THE COURT:  And is your decision voluntary?

18          DEFENDANT EHMEN:   Yes, your Honor.

19          THE COURT:  And do you understand that the

20  final decision as to what your sentence will be rests

21  entirely with me?

22          DEFENDANT EHMEN:   Yes, your Honor.

23          THE COURT:  That's subject to your right of

24  appeal as to any sentencing issues you raise.  Do you

25  understand?

Blanca I. Lara - Official Court Reporter - (312) 435-5895

33

1          DEFENDANT EHMEN:  Yes, your Honor.

2          THE COURT:  All right, would you summarize,

3    starting with Dr. Barnabas, the evidence you would be

4    offering as to Dr. Barnabas on Count 57, and,

5    generically, identify the source of the evidence.

6          I'd ask that you listen carefully,

7    Dr. Barnabas, because if you disagree with any part of

8    Ms. Stern's statement, I would need to know that.

9          DEFENDANT BARNABAS:  Yes, your Honor.

10          MS. STERN:  Judge, it would be economical for

11    me to summarize as to both of them because they are both

12    engaged in the same conduct in the same count, if that's

13    all right?

14          THE COURT:  All right, then, we'll do it that

15    way.

16          Mr. Ehmen, again, I'll ask you also to listen

17    very carefully.  And if you wish to discuss any part of

18    Ms. Stern's statement with your attorneys at any point

19    in her statement, just let me know and we'll stop the

20    proceedings so you each have an opportunity to speak

21    with your lawyers if there is any concern you have or

22    you object to any of the characterizations that are

23    made.

24          MS. STERN:  Judge, I anticipate that, at

25    trial, the government would offer numerous tape

34

1   recordings and transcripts that involve both

2   Dr. Barnabas and Mr. Ehmen, as well as two other

3   coconspirators, Dr. Rao and Dr. Kumar.

4           The evidence would also include medical

5   records relating to patients that were admitted into

6   Edgewater Hospital.  It would include financial records,

7   it would include witness testimony, it would include

8   patients who would testify, other doctors who would

9   testify, and other coconspirators who would testify,

10  including at least one patient recruiter.

11          The evidence would show that there was an

12  association, in fact, which was made up of Bainbridge

13  Management, Roger Ehmen, another individual who was an

14  officer or employee of Bainbridge Management, Dr. Rao,

15  Dr. Kumar, and others.

16          That the association, in fact, which was an

17  enterprise, had an impact on interstate commerce and

18  engaged in interstate commerce, which included the

19  submission of claims and reports to insurers out of

20  state in the receipt of payments from insurers that were

21  located out of state.

22          The evidence would show that there were

23  mailings, which have been identified in Count 57, which

24  were on or about the dates identified from the insurers

25  that are identified, relating to the patients

Blanca I. Lara - Official Court Reporter - (312) 435-5895

35

1  identified.  That those were, in fact, in furtherance of

2  the scheme.  And that there were two wires, wire

3  transfers of money from out of state into Illinois from

4  Medicaid relating to Medicaid patients.

5          The evidence would show that for Dr. Barnabas,

6  from approximately 1995 to approximately October 1998,

7  and for Roger Ehmen, from at least 1995 through the year

8  2000, there were a series of activities that occurred

9  during the scheme.

10          That the two defendants caused Edgewater to

11  give Dr. Rao a contract concerning anesthesia in

12  exchange for patient admissions.

13          That as part of that scheme, the two

14  defendants caused Edgewater to pay Dr. Rao a monthly fee

15  of $15,000 in exchange for admitting approximately

16  twenty-five to thirty medical patients, and that Dr. Rao

17  used about $12,000 of that money to pay Dr. Kumar.

18          And there would be tape recordings in which

19  those payments were explicitly discussed.  The admission

20  of patients is on tape where Dr. Kumar calls Dr. Rao,

21  Dr. Rao then calls Roger Ehmen and he arranges for those

22  patients to be admitted under Dr. Barnabas.

23          The evidence would show that Roger Ehmen

24  caused Edgewater to pay Rao a monthly fee of about

25  $20,000 for a period of time in exchange for admitting

36

1  approximately twenty-five to thirty detox patients every

2  month, and that those patients were often obtained

3  through patient recruiters and that those patients were

4  often coached, sometimes given money, in order to

5  convince them to come into the hospital.

6          The evidence would show that numerous patients

7  were admitted who did not need to be hospitalized, and

8  that that occurred for various reasons.  Some of the

9  people wanted to have a checkup and they were willing to

10 have that checkup take place in the hospital.

11         Some of the patients were told by Dr. Rao --

12         THE COURT:  Excuse me just a moment.

13     (Brief pause.)

14         THE COURT:  Sorry.  Go ahead.

15         MS. STERN:  Some of the patients were told by

16 Dr. Rao or Dr. Kumar that they were ill and needed to be

17 hospitalized when, in fact, they were not ill.

18         The evidence would show that when patients

19 were hospitalized who didn't need to be there,

20 Dr. Barnabas sometimes made false entries or exaggerated

21 symptoms into the patient's file and that other doctors

22 also made false entries into the medical records.  And

23 that certain tests were ordered by Dr. Barnabas and

24 others, including x-rays, blood tests, ultrasounds,

25 which did not need to be ordered.

37

1          The evidence would show that patients were

2    sent to the hospital without realizing that the reason

3    they were being sent to the hospital was because there

4    were kickbacks being paid in exchange for their

5    admissions.

6          The evidence would show that false claims were

7    submitted and that false information in cost reports

8    were submitted to Medicare.  That there was a waiver of

9    copayments and deductibles in order to induce patients

10   to come into the hospital.

11         So, Judge, that is what the trial would show

12   in terms of both Dr. Barnabas and Roger Ehmen.

13         In terms of Dr. Barnabas, there would be

14   relevant conduct relating to Methodist Hospital and

15   Doctors Hospital where this scheme was similar to the

16   one that I have just described.

17         THE COURT:  Well, Dr. Barnabas, in your

18   opinion, has Ms. Stern accurately described your

19   involvement in the case?

20         DEFENDANT BARNABAS:  Yes, your Honor.  Yes,

21   your Honor.

22         THE COURT:  And do you disagree with any

23   portion of her description of the activities as they

24   relate to your own conduct?

25         DEFENDANT BARNABAS:  No, your Honor.

Blanca I. Lara - Official Court Reporter - (312) 435-5895

38

1          THE COURT:  Is there anything you would like
2   to add at this time?

3          DEFENDANT BARNABAS:  Not that I can think of,
4   your Honor.

5          THE COURT:  And, Mr. Ehmen, in your judgment,
6   has Ms. Stern accurately and fairly described your
7   involvement in the case?

8          DEFENDANT EHMEN:   Yes, your Honor.

9          THE COURT:  Do you disagree with any portion
10  of the details as they relate to you?

11         DEFENDANT EHMEN:   No, your Honor.

12         THE COURT:  Is there anything you would like
13  to add at this time?

14         DEFENDANT EHMEN:   Just that I'm very sorry
15  for my actions and I accept full responsibility for
16  them.

17         THE COURT:  All right, Dr. Barnabas?

18         DEFENDANT BARNABAS:  My apologies to the Court
19  and to my patients, your Honor, and I also accept full
20  responsibility for my actions.

21         THE COURT:  Let me ask you, Dr. Barnabas, what
22  plea do you wish to enter to Count 57 of the indictment,
23  guilty or not guilty?

24         DEFENDANT BARNABAS:  Guilty, your Honor.

25         THE COURT:  Since you acknowledge that you